**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 14-1167

TIMOTHY B. BOSTIC; TONY C. LONDON; CAROL SCHALL; MARY
TOWNLEY,

                Plaintiffs – Appellees,

JOANNE HARRIS; JESSICA DUFF; CHRISTY BERGHOFF; VICTORIA
KIDD, on behalf of themselves and all others similarly
situated,

                Intervenors,

       v.

GEORGE E. SCHAEFER, III, in his official capacity as the
Clerk of Court for Norfolk Circuit Court,

                Defendant – Appellant,

      and

JANET M. RAINEY, in her official capacity as State Registrar
of Vital Records; ROBERT F. MCDONNELL, in his official
capacity as Governor of Virginia; KENNETH T. CUCCINELLI, II,
in his official capacity as Attorney General of Virginia,

                Defendants,

MICHÈLE MCQUIGG,

                Intervenor/Defendant.

-------------------------------------

DAVID A. ROBINSON; ALAN J. HAWKINS; JASON S. CARROLL; NORTH
CAROLINA VALUES COALITION; LIBERTY, LIFE, AND LAW
FOUNDATION; SOCIAL SCIENCE PROFESSORS; FAMILY RESEARCH
COUNCIL; VIRGINIA CATHOLIC CONFERENCE, LLC; CENTER FOR
CONSTITUTIONAL JURISPRUDENCE; STATE OF WEST VIRGINIA;

INSTITUTE FOR MARRIAGE AND PUBLIC POLICY; HELEN M. ALVARE; STATE OF INDIANA; STATE OF ALABAMA; STATE OF ALASKA; STATE OF ARIZONA; STATE OF COLORADO; STATE OF IDAHO; STATE OF LOUISIANA; STATE OF MONTANA; STATE OF NEBRASKA; STATE OF OKLAHOMA; STATE OF SOUTH CAROLINA; STATE OF SOUTH DAKOTA; STATE OF UTAH; STATE OF WYOMING; WALLBUILDERS, LLC; LIBERTY COUNSEL; AMERICAN COLLEGE OF PEDIATRICIANS; SCHOLARS OF HISTORY AND RELATED DISCIPLINES; AMERICAN LEADERSHIP FUND; ROBERT P. GEORGE; SHERIF GIRGIS; RYAN T. ANDERSON; PAUL MCHUGH; UNITED STATES CONFERENCE OF CATHOLIC BISHOPS; NATIONAL ASSOCIATION OF EVANGELICALS; CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS; THE ETHICS & RELIGIOUS LIBERTY COMMISSION OF THE SOUTHERN BAPTIST CONVENTION; LUTHERAN CHURCH-MISSOURI SYNOD; THE BECKET FUND FOR RELIGIOUS LIBERTY; EAGLE FORUM EDUCATION AND LEGAL DEFENSE FUND; DAVID BOYLE; ROBERT OSCAR LOPEZ; CONCERNED WOMEN FOR AMERICA; THE FAMILY FOUNDATION OF VIRGINIA,

Amici Supporting Appellant,

CONSTITUTIONAL LAW SCHOLARS; ASHUTOSH BHAGWAT; LEE BOLLINGER; ERWIN CHEMERINSKY; WALTER DELLINGER; MICHAEL C. DORF; LEE EPSTEIN; DANIEL FARBER; BARRY FRIEDMAN; MICHAEL JAY GERHARDT, Professor; DEBORAH HELLMAN; JOHN CALVIN JEFFRIES, JR.; LAWRENCE LESSIG; WILLIAM MARSHALL; FRANK MICHELMAN; JANE S. SCHACTER; CHRISTOPHER H. SCHROEDER; SUZANNA SHERRY; GEOFFREY R. STONE; DAVID STRAUSS; LAURENCE H. TRIBE, Professor; WILLIAM VAN ALSTYNE; OUTSERVE-SLDN; THE AMERICAN MILITARY PARTNER ASSOCIATION; THE AMERICAN SOCIOLOGICAL ASSOCIATION; VIRGINIA CONSTITUTIONAL LAW PROFESSORS; AMERICAN PSYCHOLOGICAL ASSOCIATION; THE AMERICAN ACADEMY OF PEDIATRICS; AMERICAN PSYCHIATRIC ASSOCIATION; NATIONAL ASSOCIATION OF SOCIAL WORKERS; VIRGINIA PSYCHOLOGICAL ASSOCIATION; EQUALITY NC; SOUTH CAROLINA QUALITY COALITION; CHANTELLE FISHER-BORNE; MARCIE FISHER-BORNE; CRYSTAL HENDRIX; LEIGH SMITH; SHANA CARIGNAN; MEGAN PARKER; TERRI BECK; LESLIE ZANAGLIO; LEE KNIGHT CAFFERY; DANA DRAA; SHAWN LONG; CRAIG JOHNSON; ESMERALDA MEJIA; CHRISTINA GINTER-MEJIA; CATO INSTITUTE; CONSTITUTIONAL ACCOUNTABILITY CENTER; HISTORIANS OF MARRIAGE; PETER W. BARDAGLIO; NORMA BASCH; STEPHANIE COONTZ; NANCY F. COTT; TOBY L. DITZ; ARIELA R. DUBLER; LAURA F. EDWARDS; SARAH BARRINGER GORDON; MICHAEL GROSSBERG; HENDRIK HARTOG; ELLEN HERMAN; MARTHA HODES; LINDA K. KERBER; ALICE KESSLER-HARRIS; ELAINE TYLER MAY; SERENA MAYERI; STEVEN MINTZ; ELIZABETH PLECK; CAROLE SHAMMAS; MARY L. SHANLEY; AMY DRU STANLEY; BARBARA WELKE; PARENTS, FAMILIES AND FRIENDS OF

2

LESBIANS AND GAYS, INC.; KERRY ABRAMS, Albert Clark Tate, Jr. Professor of Law, University of Virginia School of Law; VIVIAN HAMILTON, Professor of Law, William and Mary; MEREDITH HARBACH, Professor of Law, University of Richmond; JOAN HEIFETZ HOLLINGER, John and Elizabeth Boalt Lecturer in Residence, University of California, Berkeley School of Law; COURTNEY G. JOSLIN, Professor of Law, University of California, Davis School of Law; NAACP LEGAL DEFENSE AND EDUCATION FUND, INC.; NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE; HOWARD UNIVERSITY SCHOOL OF LAW CIVIL RIGHTS CLINIC; FAMILY EQUALITY COUNCIL; COLAGE; GLMA: HEALTH PROFESSIONALS ADVANCING LGBT EQUALITY; WILLIAM N. ESKRIDGE, JR.; REBECCA L. BROWN; DANIEL A. FARBER; MICHAEL GERHARDT; JACK KNIGHT; ANDREW KOPPELMAN; MELISSA LAMB SAUNDERS; NEIL S. SIEGEL; JANA B. SINGER; HISTORIANS OF ANTI-GAY DISCRIMINATION; ANTI-DEFAMATION LEAGUE; AMERICANS UNITED FOR SEPARATION OF CHURCH AND STATE; BEND THE ARC: A JEWISH PARTNERSHIP FOR JUSTICE; HADASSAH, THE WOMEN'S ZIONIST ORGANIZATION OF AMERICA; HINDU AMERICAN FOUNDATION; THE INTERFAITH ALLIANCE FOUNDATION; JAPANESE AMERICAN CITIZENS LEAGUE; JEWISH SOCIAL POLICY ACTION NETWORK; KESHET; METROPOLITAN COMMUNITY CHURCHES; MORE LIGHT PRESBYTERIANS; THE NATIONAL COUNCIL OF JEWISH WOMEN; NEHIRIM; PEOPLE FOR THE AMERICAN WAY FOUNDATION; PRESBYTERIAN WELCOME; RECONCILINGWORKS: LUTHERANS FOR FULL PARTICIPATION; RELIGIOUS INSTITUTE, INC.; SIKH AMERICAN LEGAL DEFENSE AND EDUCATION FUND; SOCIETY FOR HUMANISTIC JUDAISM; T'RUAH: THE RABBINIC CALL FOR HUMAN RIGHTS; WOMEN'S LEAGUE FOR CONSERVATIVE JUDAISM; COLUMBIA LAW SCHOOL SEXUALITY AND GENDER LAW CLINIC; BISHOPS OF THE EPISCOPAL CHURCH IN VIRGINIA; CENTRAL ATLANTIC CONFERENCE OF THE UNITED CHURCH OF CHRIST; CENTRAL CONFERENCE OF AMERICAN RABBIS; MORMONS FOR EQUALITY; RECONSTRUCTIONIST RABBINICAL ASSOCIATION; RECONSTRUCTIONIST RABBINICAL COLLEGE AND JEWISH RECONSTRUCTIONIST COMMUNITIES; UNION FOR REFORM JUDAISM; THE UNITARIAN UNIVERSALIST ASSOCIATION; AFFIRMATION; COVENANT NETWORK OF PRESBYTERIANS; METHODIST FEDERATION FOR SOCIAL ACTION; MORE LIGHT PRESBYTERIANS; PRESBYTERIAN WELCOME; RECONCILING MINISTRIES NETWORK; RECONCILINGWORKS: LUTHERANS FOR FULL PARTICIPATION; RELIGIOUS INSTITUTE, INC.; WOMEN OF REFORM JUDAISM; 28 EMPLOYERS AND ORGANIZATIONS REPRESENTING EMPLOYERS; COMMONWEALTH OF MASSACHUSETTS; STATE OF CALIFORNIA; STATE OF CONNECTICUT; DISTRICT OF COLUMBIA; STATE OF ILLINOIS; STATE OF IOWA; STATE OF MAINE; STATE OF MARYLAND; STATE OF NEW HAMPSHIRE; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF OREGON; STATE OF VERMONT; STATE OF WASHINGTON; GARY J. GATES; NATIONAL AND WESTERN STATES

3

WOMEN'S RIGHTS ORGANIZATIONS; VIRGINIA CHAPTER OF THE AMERICAN ACADEMY OF MATRIMONIAL LAWYERS; THE NATIONAL WOMEN'S LAW CENTER; EQUAL RIGHTS ADVOCATES; LEGAL MOMENTUM; NATIONAL ASSOCIATION OF WOMEN LAWYERS; NATIONAL PARTNERSHIP FOR WOMEN & FAMILIES; SOUTHWEST WOMEN'S LAW CENTER; WOMEN'S LAW PROJECT; PROFESSORS OF LAW ASSOCIATED WITH THE WILLIAMS INSTITUTE; BAY AREA LAWYERS FOR INDIVIDUAL FREEDOM; LEADERSHIP CONFERENCE ON CIVIL AND HUMAN RIGHTS; PUBLIC INTEREST ORGANIZATIONS; BAR ASSOCIATIONS; FAMILY LAW AND CONFLICT OF LAWS PROFESSORS; GAY AND LESBIAN ADVOCATES AND DEFENDERS; PEOPLE OF FAITH FOR EQUALITY IN VIRGINIA; CELEBRATION CENTER FOR SPIRITUAL LIVING; CLARENDON PRESBYTERIAN CHURCH; COMMONWEALTH BAPTIST CHURCH; CONGREGATION OR AMI; HOPE UNITED CHURCH OF CHRIST; LITTLE RIVER UCC; METROPOLITAN COMMUNITY CHURCH OF NORTHERN VIRGINIA; MT. VERNON UNITARIAN CHURCH; ST. JAMES UCC,; ST. JOHN'S UCC; NEW LIFE METROPOLITAN COMMUNITY CHURCH; UNITARIAN UNIVERSALIST FELLOWSHIP OF THE PENINSULA; UNITARIAN UNIVERSALIST CONGREGATION OF STERLING; UNITED CHURCH OF CHRIST OF FREDERICKSBURG; UNITARIAN UNIVERSALIST CHURCH OF LOUDOUN; ANDREW MERTZ; REV. MARIE HULM ADAM; REV. MARTY ANDERSON; REV ROBIN ANDERSON; REV. VERNE ARENS; RABBI LIA BASS; REV. JOSEPH G. BEATTIE; REV. SUE BROWNING; REV. JIM BUNDY; REV. MARK BYRD; REV. STEVEN C. CLUNN; REV. DR. JOHN COPERHAVER; RABBI GARY CREDITOR; REV. DAVID ENSIGN; REV. HENRY FAIRMAN; RABBI JESSE GALLOP; REV. TOM GERSTENLAUER; REV. ROBIN H. GORSLINE; REV. TRISH HALL; REV. WARREN HAMMONDS; REV. JON HEASLET; REV. DOUGLAS HODGES; REV. PHYLLIS HUBBELL; REV. STEPHEN G. HYDE; REV. JANET JAMES; REV. JOHN MANWELL; REV. JAMES W. MCNEAL; REV. MARC BOSWELL; REV. ANDREW CLIVE MILLARD; REV. DR. MELANIE MILLER; REV. AMBER NEUROTH; REV. JAMES PAPILE; REV. LINDA OLSON PEEBLES; REV. DON PRANGE; RABBI MICHAEL RAGOZIN; RABBI BEN ROMER; REV. JENNIFER RYU; REV. ANYA SAMMLER-MICHAEL; REV. AMY SCHWARTZMAN; REV. DANNY SPEARS; REV. MARK SURIANO; REV. ROB VAUGHN; REV. DANIEL VELEZ-RIVERA; REV. KATE R. WALKER; REV. TERRYE WILLIAMS; REV. DR. KAREN-MARIE YUST,

Amici Supporting Appellees.

TIMOTHY B. BOSTIC; TONY C. LONDON; CAROL SCHALL; MARY TOWNLEY,

Plaintiffs – Appellees,

JOANNE HARRIS; JESSICA DUFF; CHRISTY BERGHOFF; VICTORIA KIDD, on behalf of themselves and all others similarly situated,

Intervenors,

v.

JANET M. RAINEY, in her official capacity as State Registrar of Vital Records,

Defendant – Appellant,

and

GEORGE E. SCHAEFER, III, in his official capacity as the Clerk of Court for Norfolk Circuit Court; ROBERT F. MCDONNELL, in his official capacity as Governor of Virginia; KENNETH T. CUCCINELLI, II, in his official capacity as Attorney General of Virginia,

Defendants,

MICHÈLE MCQUIGG,

Intervenor/Defendant.

--------------------------------------

DAVID A. ROBINSON; ALAN J. HAWKINS; JASON S. CARROLL; NORTH CAROLINA VALUES COALITION; LIBERTY, LIFE, AND LAW FOUNDATION; SOCIAL SCIENCE PROFESSORS; FAMILY RESEARCH COUNCIL; VIRGINIA CATHOLIC CONFERENCE, LLC; CENTER FOR CONSTITUTIONAL JURISPRUDENCE; STATE OF WEST VIRGINIA; INSTITUTE FOR MARRIAGE AND PUBLIC POLICY; HELEN M. ALVARE; STATE OF INDIANA; STATE OF ALABAMA; STATE OF ALASKA; STATE OF ARIZONA; STATE OF COLORADO; STATE OF IDAHO; STATE OF

LOUISIANA; STATE OF MONTANA; STATE OF NEBRASKA; STATE OF OKLAHOMA; STATE OF SOUTH CAROLINA; STATE OF SOUTH DAKOTA; STATE OF UTAH; STATE OF WYOMING; WALLBUILDERS, LLC; LIBERTY COUNSEL; AMERICAN COLLEGE OF PEDIATRICIANS; SCHOLARS OF HISTORY AND RELATED DISCIPLINES; AMERICAN LEADERSHIP FUND; ROBERT P. GEORGE; SHERIF GIRGIS; RYAN T. ANDERSON; PAUL MCHUGH; UNITED STATES CONFERENCE OF CATHOLIC BISHOPS; NATIONAL ASSOCIATION OF EVANGELICALS; CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS; THE ETHICS & RELIGIOUS LIBERTY COMMISSION OF THE SOUTHERN BAPTIST CONVENTION; LUTHERAN CHURCH-MISSOURI SYNOD; THE BECKET FUND FOR RELIGIOUS LIBERTY; EAGLE FORUM EDUCATION AND LEGAL DEFENSE FUND; DAVID BOYLE; ROBERT OSCAR LOPEZ; CONCERNED WOMEN FOR AMERICA; THE FAMILY FOUNDATION OF VIRGINIA,

Amici Supporting Appellant,

CONSTITUTIONAL LAW SCHOLARS; ASHUTOSH BHAGWAT; LEE BOLLINGER; ERWIN CHEMERINSKY; WALTER DELLINGER; MICHAEL C. DORF; LEE EPSTEIN; DANIEL FARBER; BARRY FRIEDMAN; MICHAEL JAY GERHARDT, Professor; DEBORAH HELLMAN; JOHN CALVIN JEFFRIES, JR.; LAWRENCE LESSIG; WILLIAM MARSHALL; FRANK MICHELMAN; JANE S. SCHACTER; CHRISTOPHER H. SCHROEDER; SUZANNA SHERRY; GEOFFREY R. STONE; DAVID STRAUSS; LAURENCE H. TRIBE, Professor; WILLIAM VAN ALSTYNE; OUTSERVE-SLDN; THE AMERICAN MILITARY PARTNER ASSOCIATION; THE AMERICAN SOCIOLOGICAL ASSOCIATION; VIRGINIA CONSTITUTIONAL LAW PROFESSORS; AMERICAN PSYCHOLOGICAL ASSOCIATION; THE AMERICAN ACADEMY OF PEDIATRICS; AMERICAN PSYCHIATRIC ASSOCIATION; NATIONAL ASSOCIATION OF SOCIAL WORKERS; VIRGINIA PSYCHOLOGICAL ASSOCIATION; EQUALITY NC; SOUTH CAROLINA QUALITY COALITION; CHANTELLE FISHER-BORNE; MARCIE FISHER-BORNE; CRYSTAL HENDRIX; LEIGH SMITH; SHANA CARIGNAN; MEGAN PARKER; TERRI BECK; LESLIE ZANAGLIO; LEE KNIGHT CAFFERY; DANA DRAA; SHAWN LONG; CRAIG JOHNSON; ESMERALDA MEJIA; CHRISTINA GINTER-MEJIA; CATO INSTITUTE; CONSTITUTIONAL ACCOUNTABILITY CENTER; HISTORIANS OF MARRIAGE; PETER W. BARDAGLIO; NORMA BASCH; STEPHANIE COONTZ; NANCY F. COTT; TOBY L. DITZ; ARIELA R. DUBLER; LAURA F. EDWARDS; SARAH BARRINGER GORDON; MICHAEL GROSSBERG; HENDRIK HARTOG; ELLEN HERMAN; MARTHA HODES; LINDA K. KERBER; ALICE KESSLER-HARRIS; ELAINE TYLER MAY; SERENA MAYERI; STEVEN MINTZ; ELIZABETH PLECK; CAROLE SHAMMAS; MARY L. SHANLEY; AMY DRU STANLEY; BARBARA WELKE; PARENTS, FAMILIES AND FRIENDS OF LESBIANS AND GAYS, INC.; KERRY ABRAMS, Albert Clark Tate, Jr. Professor of Law, University of Virginia School of Law; VIVIAN HAMILTON, Professor of Law, William and Mary;

6

MEREDITH HARBACH, Professor of Law, University of Richmond; JOAN HEIFETZ HOLLINGER, John and Elizabeth Boalt Lecturer in Residence, University of California, Berkeley School of Law; COURTNEY G. JOSLIN, Professor of Law, University of California, Davis School of Law; NAACP LEGAL DEFENSE AND EDUCATION FUND, INC.; NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE; HOWARD UNIVERSITY SCHOOL OF LAW CIVIL RIGHTS CLINIC; FAMILY EQUALITY COUNCIL; COLAGE; GLMA: HEALTH PROFESSIONALS ADVANCING LGBT EQUALITY; WILLIAM N. ESKRIDGE, JR.; REBECCA L. BROWN; DANIEL A. FARBER; MICHAEL GERHARDT; JACK KNIGHT; ANDREW KOPPELMAN; MELISSA LAMB SAUNDERS; NEIL S. SIEGEL; JANA B. SINGER; HISTORIANS OF ANTI-GAY DISCRIMINATION; ANTI-DEFAMATION LEAGUE; AMERICANS UNITED FOR SEPARATION OF CHURCH AND STATE; BEND THE ARC: A JEWISH PARTNERSHIP FOR JUSTICE; HADASSAH, THE WOMEN'S ZIONIST ORGANIZATION OF AMERICA; HINDU AMERICAN FOUNDATION; THE INTERFAITH ALLIANCE FOUNDATION; JAPANESE AMERICAN CITIZENS LEAGUE; JEWISH SOCIAL POLICY ACTION NETWORK; KESHET; METROPOLITAN COMMUNITY CHURCHES; MORE LIGHT PRESBYTERIANS; THE NATIONAL COUNCIL OF JEWISH WOMEN; NEHIRIM; PEOPLE FOR THE AMERICAN WAY FOUNDATION; PRESBYTERIAN WELCOME; RECONCILINGWORKS: LUTHERANS FOR FULL PARTICIPATION; RELIGIOUS INSTITUTE, INC.; SIKH AMERICAN LEGAL DEFENSE AND EDUCATION FUND; SOCIETY FOR HUMANISTIC JUDAISM; T'RUAH: THE RABBINIC CALL FOR HUMAN RIGHTS; WOMEN'S LEAGUE FOR CONSERVATIVE JUDAISM; COLUMBIA LAW SCHOOL SEXUALITY AND GENDER LAW CLINIC; BISHOPS OF THE EPISCOPAL CHURCH IN VIRGINIA; CENTRAL ATLANTIC CONFERENCE OF THE UNITED CHURCH OF CHRIST; CENTRAL CONFERENCE OF AMERICAN RABBIS; MORMONS FOR EQUALITY; RECONSTRUCTIONIST RABBINICAL ASSOCIATION; RECONSTRUCTIONIST RABBINICAL COLLEGE AND JEWISH RECONSTRUCTIONIST COMMUNITIES; UNION FOR REFORM JUDAISM; THE UNITARIAN UNIVERSALIST ASSOCIATION; AFFIRMATION; COVENANT NETWORK OF PRESBYTERIANS; METHODIST FEDERATION FOR SOCIAL ACTION; MORE LIGHT PRESBYTERIANS; PRESBYTERIAN WELCOME; RECONCILING MINISTRIES NETWORK; RECONCILINGWORKS: LUTHERANS FOR FULL PARTICIPATION; RELIGIOUS INSTITUTE, INC.; WOMEN OF REFORM JUDAISM; 28 EMPLOYERS AND ORGANIZATIONS REPRESENTING EMPLOYERS; COMMONWEALTH OF MASSACHUSETTS; STATE OF CALIFORNIA; STATE OF CONNECTICUT; DISTRICT OF COLUMBIA; STATE OF ILLINOIS; STATE OF IOWA; STATE OF MAINE; STATE OF MARYLAND; STATE OF NEW HAMPSHIRE; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF OREGON; STATE OF VERMONT; STATE OF WASHINGTON; GARY J. GATES; NATIONAL AND WESTERN STATES WOMEN'S RIGHTS ORGANIZATIONS; VIRGINIA CHAPTER OF THE AMERICAN ACADEMY OF MATRIMONIAL LAWYERS; THE NATIONAL WOMEN'S LAW CENTER; EQUAL RIGHTS ADVOCATES; LEGAL MOMENTUM;

NATIONAL ASSOCIATION OF WOMEN LAWYERS; NATIONAL PARTNERSHIP FOR WOMEN & FAMILIES; SOUTHWEST WOMEN'S LAW CENTER; WOMEN'S LAW PROJECT; PROFESSORS OF LAW ASSOCIATED WITH THE WILLIAMS INSTITUTE; BAY AREA LAWYERS FOR INDIVIDUAL FREEDOM; LEADERSHIP CONFERENCE ON CIVIL AND HUMAN RIGHTS; PUBLIC INTEREST ORGANIZATIONS; BAR ASSOCIATIONS; FAMILY LAW AND CONFLICT OF LAWS PROFESSORS; GAY AND LESBIAN ADVOCATES AND DEFENDERS; PEOPLE OF FAITH FOR EQUALITY IN VIRGINIA; CELEBRATION CENTER FOR SPIRITUAL LIVING; CLARENDON PRESBYTERIAN CHURCH; COMMONWEALTH BAPTIST CHURCH; CONGREGATION OR AMI; HOPE UNITED CHURCH OF CHRIST; LITTLE RIVER UCC; METROPOLITAN COMMUNITY CHURCH OF NORTHERN VIRGINIA; MT. VERNON UNITARIAN CHURCH; ST. JAMES UCC,; ST. JOHN'S UCC; NEW LIFE METROPOLITAN COMMUNITY CHURCH; UNITARIAN UNIVERSALIST FELLOWSHIP OF THE PENINSULA; UNITARIAN UNIVERSALIST CONGREGATION OF STERLING; UNITED CHURCH OF CHRIST OF FREDERICKSBURG; UNITARIAN UNIVERSALIST CHURCH OF LOUDOUN; ANDREW MERTZ; REV. MARIE HULM ADAM; REV. MARTY ANDERSON; REV ROBIN ANDERSON; REV. VERNE ARENS; RABBI LIA BASS; REV. JOSEPH G. BEATTIE; REV. SUE BROWNING; REV. JIM BUNDY; REV. MARK BYRD; REV. STEVEN C. CLUNN; REV. DR. JOHN COPERHAVER; RABBI GARY CREDITOR; REV. DAVID ENSIGN; REV. HENRY FAIRMAN; RABBI JESSE GALLOP; REV. TOM GERSTENLAUER; REV. ROBIN H. GORSLINE; REV. TRISH HALL; REV. WARREN HAMMONDS; REV. JON HEASLET; REV. DOUGLAS HODGES; REV. PHYLLIS HUBBELL; REV. STEPHEN G. HYDE; REV. JANET JAMES; REV. JOHN MANWELL; REV. JAMES W. MCNEAL; REV. MARC BOSWELL; REV. ANDREW CLIVE MILLARD; REV. DR. MELANIE MILLER; REV. AMBER NEUROTH; REV. JAMES PAPILE; REV. LINDA OLSON PEEBLES; REV. DON PRANGE; RABBI MICHAEL RAGOZIN; RABBI BEN ROMER; REV. JENNIFER RYU; REV. ANYA SAMMLER-MICHAEL; REV. AMY SCHWARTZMAN; REV. DANNY SPEARS; REV. MARK SURIANO; REV. ROB VAUGHN; REV. DANIEL VELEZ-RIVERA; REV. KATE R. WALKER; REV. TERRYE WILLIAMS; REV. DR. KAREN-MARIE YUST,

Amici Supporting Appellees.

TIMOTHY B. BOSTIC; TONY C. LONDON; CAROL SCHALL; MARY TOWNLEY,

Plaintiffs – Appellees,

JOANNE HARRIS; JESSICA DUFF; CHRISTY BERGHOFF; VICTORIA KIDD, on behalf of themselves and all others similarly situated,

Intervenors,

v.

MICHÈLE MCQUIGG,

Intervenor/Defendant – Appellant,

and

GEORGE E. SCHAEFER, III, in his official capacity as the Clerk of Court for Norfolk Circuit Court; JANET M. RAINEY, in her official capacity as State Registrar of Vital Records; ROBERT F. MCDONNELL, in his official capacity as Governor of Virginia; KENNETH T. CUCCINELLI, II, in his official capacity as Attorney General of Virginia,

Defendants.

---------------------------------------

DAVID A. ROBINSON; ALAN J. HAWKINS; JASON S. CARROLL; NORTH CAROLINA VALUES COALITION; LIBERTY, LIFE, AND LAW FOUNDATION; SOCIAL SCIENCE PROFESSORS; FAMILY RESEARCH COUNCIL; VIRGINIA CATHOLIC CONFERENCE, LLC; CENTER FOR CONSTITUTIONAL JURISPRUDENCE; STATE OF WEST VIRGINIA; INSTITUTE FOR MARRIAGE AND PUBLIC POLICY; HELEN M. ALVARE; STATE OF INDIANA; STATE OF ALABAMA; STATE OF ALASKA; STATE OF ARIZONA; STATE OF COLORADO; STATE OF IDAHO; STATE OF LOUISIANA; STATE OF MONTANA; STATE OF NEBRASKA; STATE OF OKLAHOMA; STATE OF SOUTH CAROLINA; STATE OF SOUTH DAKOTA; STATE OF UTAH; STATE OF WYOMING; WALLBUILDERS, LLC; LIBERTY COUNSEL; AMERICAN COLLEGE OF PEDIATRICIANS; SCHOLARS OF

HISTORY AND RELATED DISCIPLINES; AMERICAN LEADERSHIP FUND; ROBERT P. GEORGE; SHERIF GIRGIS; RYAN T. ANDERSON; PAUL MCHUGH; UNITED STATES CONFERENCE OF CATHOLIC BISHOPS; NATIONAL ASSOCIATION OF EVANGELICALS; CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS; THE ETHICS & RELIGIOUS LIBERTY COMMISSION OF THE SOUTHERN BAPTIST CONVENTION; LUTHERAN CHURCH-MISSOURI SYNOD; THE BECKET FUND FOR RELIGIOUS LIBERTY; EAGLE FORUM EDUCATION AND LEGAL DEFENSE FUND; DAVID BOYLE; ROBERT OSCAR LOPEZ; CONCERNED WOMEN FOR AMERICA; THE FAMILY FOUNDATION OF VIRGINIA,

Amici Supporting Appellant,

CONSTITUTIONAL LAW SCHOLARS; ASHUTOSH BHAGWAT; LEE BOLLINGER; ERWIN CHEMERINSKY; WALTER DELLINGER; MICHAEL C. DORF; LEE EPSTEIN; DANIEL FARBER; BARRY FRIEDMAN; MICHAEL JAY GERHARDT, Professor; DEBORAH HELLMAN; JOHN CALVIN JEFFRIES, JR.; LAWRENCE LESSIG; WILLIAM MARSHALL; FRANK MICHELMAN; JANE S. SCHACTER; CHRISTOPHER H. SCHROEDER; SUZANNA SHERRY; GEOFFREY R. STONE; DAVID STRAUSS; LAURENCE H. TRIBE, Professor; WILLIAM VAN ALSTYNE; OUTSERVE-SLDN; THE AMERICAN MILITARY PARTNER ASSOCIATION; THE AMERICAN SOCIOLOGICAL ASSOCIATION; VIRGINIA CONSTITUTIONAL LAW PROFESSORS; AMERICAN PSYCHOLOGICAL ASSOCIATION; THE AMERICAN ACADEMY OF PEDIATRICS; AMERICAN PSYCHIATRIC ASSOCIATION; NATIONAL ASSOCIATION OF SOCIAL WORKERS; VIRGINIA PSYCHOLOGICAL ASSOCIATION; EQUALITY NC; SOUTH CAROLINA QUALITY COALITION; CHANTELLE FISHER-BORNE; MARCIE FISHER-BORNE; CRYSTAL HENDRIX; LEIGH SMITH; SHANA CARIGNAN; MEGAN PARKER; TERRI BECK; LESLIE ZANAGLIO; LEE KNIGHT CAFFERY; DANA DRAA; SHAWN LONG; CRAIG JOHNSON; ESMERALDA MEJIA; CHRISTINA GINTER-MEJIA; CATO INSTITUTE; CONSTITUTIONAL ACCOUNTABILITY CENTER; HISTORIANS OF MARRIAGE; PETER W. BARDAGLIO; NORMA BASCH; STEPHANIE COONTZ; NANCY F. COTT; TOBY L. DITZ; ARIELA R. DUBLER; LAURA F. EDWARDS; SARAH BARRINGER GORDON; MICHAEL GROSSBERG; HENDRIK HARTOG; ELLEN HERMAN; MARTHA HODES; LINDA K. KERBER; ALICE KESSLER-HARRIS; ELAINE TYLER MAY; SERENA MAYERI; STEVEN MINTZ; ELIZABETH PLECK; CAROLE SHAMMAS; MARY L. SHANLEY; AMY DRU STANLEY; BARBARA WELKE; PARENTS, FAMILIES AND FRIENDS OF LESBIANS AND GAYS, INC.; KERRY ABRAMS, Albert Clark Tate, Jr. Professor of Law, University of Virginia School of Law; VIVIAN HAMILTON, Professor of Law, William and Mary; MEREDITH HARBACH, Professor of Law, University of Richmond; JOAN HEIFETZ HOLLINGER, John and Elizabeth Boalt Lecturer in Residence, University of California, Berkeley School of Law; COURTNEY G. JOSLIN, Professor of Law, University of

10

California, Davis School of Law; NAACP LEGAL DEFENSE AND EDUCATION FUND, INC.; NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE; HOWARD UNIVERSITY SCHOOL OF LAW CIVIL RIGHTS CLINIC; FAMILY EQUALITY COUNCIL; COLAGE; GLMA: HEALTH PROFESSIONALS ADVANCING LGBT EQUALITY; WILLIAM N. ESKRIDGE, JR.; REBECCA L. BROWN; DANIEL A. FARBER; MICHAEL GERHARDT; JACK KNIGHT; ANDREW KOPPELMAN; MELISSA LAMB SAUNDERS; NEIL S. SIEGEL; JANA B. SINGER; HISTORIANS OF ANTI-GAY DISCRIMINATION; ANTI-DEFAMATION LEAGUE; AMERICANS UNITED FOR SEPARATION OF CHURCH AND STATE; BEND THE ARC: A JEWISH PARTNERSHIP FOR JUSTICE; HADASSAH, THE WOMEN'S ZIONIST ORGANIZATION OF AMERICA; HINDU AMERICAN FOUNDATION; THE INTERFAITH ALLIANCE FOUNDATION; JAPANESE AMERICAN CITIZENS LEAGUE; JEWISH SOCIAL POLICY ACTION NETWORK; KESHET; METROPOLITAN COMMUNITY CHURCHES; MORE LIGHT PRESBYTERIANS; THE NATIONAL COUNCIL OF JEWISH WOMEN; NEHIRIM; PEOPLE FOR THE AMERICAN WAY FOUNDATION; PRESBYTERIAN WELCOME; RECONCILINGWORKS: LUTHERANS FOR FULL PARTICIPATION; RELIGIOUS INSTITUTE, INC.; SIKH AMERICAN LEGAL DEFENSE AND EDUCATION FUND; SOCIETY FOR HUMANISTIC JUDAISM; T'RUAH: THE RABBINIC CALL FOR HUMAN RIGHTS; WOMEN'S LEAGUE FOR CONSERVATIVE JUDAISM; COLUMBIA LAW SCHOOL SEXUALITY AND GENDER LAW CLINIC; BISHOPS OF THE EPISCOPAL CHURCH IN VIRGINIA; CENTRAL ATLANTIC CONFERENCE OF THE UNITED CHURCH OF CHRIST; CENTRAL CONFERENCE OF AMERICAN RABBIS; MORMONS FOR EQUALITY; RECONSTRUCTIONIST RABBINICAL ASSOCIATION; RECONSTRUCTIONIST RABBINICAL COLLEGE AND JEWISH RECONSTRUCTIONIST COMMUNITIES; UNION FOR REFORM JUDAISM; THE UNITARIAN UNIVERSALIST ASSOCIATION; AFFIRMATION; COVENANT NETWORK OF PRESBYTERIANS; METHODIST FEDERATION FOR SOCIAL ACTION; MORE LIGHT PRESBYTERIANS; PRESBYTERIAN WELCOME; RECONCILING MINISTRIES NETWORK; RECONCILINGWORKS: LUTHERANS FOR FULL PARTICIPATION; RELIGIOUS INSTITUTE, INC.; WOMEN OF REFORM JUDAISM; 28 EMPLOYERS AND ORGANIZATIONS REPRESENTING EMPLOYERS; COMMONWEALTH OF MASSACHUSETTS; STATE OF CALIFORNIA; STATE OF CONNECTICUT; DISTRICT OF COLUMBIA; STATE OF ILLINOIS; STATE OF IOWA; STATE OF MAINE; STATE OF MARYLAND; STATE OF NEW HAMPSHIRE; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF OREGON; STATE OF VERMONT; STATE OF WASHINGTON; GARY J. GATES; NATIONAL AND WESTERN STATES WOMEN'S RIGHTS ORGANIZATIONS; VIRGINIA CHAPTER OF THE AMERICAN ACADEMY OF MATRIMONIAL LAWYERS; THE NATIONAL WOMEN'S LAW CENTER; EQUAL RIGHTS ADVOCATES; LEGAL MOMENTUM; NATIONAL ASSOCIATION OF WOMEN LAWYERS; NATIONAL PARTNERSHIP FOR WOMEN & FAMILIES; SOUTHWEST WOMEN'S LAW CENTER; WOMEN'S LAW PROJECT; PROFESSORS OF LAW ASSOCIATED WITH THE WILLIAMS INSTITUTE; BAY AREA LAWYERS FOR INDIVIDUAL FREEDOM;

LEADERSHIP CONFERENCE ON CIVIL AND HUMAN RIGHTS; PUBLIC INTEREST ORGANIZATIONS; BAR ASSOCIATIONS; FAMILY LAW AND CONFLICT OF LAWS PROFESSORS; GAY AND LESBIAN ADVOCATES AND DEFENDERS; PEOPLE OF FAITH FOR EQUALITY IN VIRGINIA; CELEBRATION CENTER FOR SPIRITUAL LIVING; CLARENDON PRESBYTERIAN CHURCH; COMMONWEALTH BAPTIST CHURCH; CONGREGATION OR AMI; HOPE UNITED CHURCH OF CHRIST; LITTLE RIVER UCC; METROPOLITAN COMMUNITY CHURCH OF NORTHERN VIRGINIA; MT. VERNON UNITARIAN CHURCH; ST. JAMES UCC,; ST. JOHN'S UCC; NEW LIFE METROPOLITAN COMMUNITY CHURCH; UNITARIAN UNIVERSALIST FELLOWSHIP OF THE PENINSULA; UNITARIAN UNIVERSALIST CONGREGATION OF STERLING; UNITED CHURCH OF CHRIST OF FREDERICKSBURG; UNITARIAN UNIVERSALIST CHURCH OF LOUDOUN; ANDREW MERTZ; REV. MARIE HULM ADAM; REV. MARTY ANDERSON; REV ROBIN ANDERSON; REV. VERNE ARENS; RABBI LIA BASS; REV. JOSEPH G. BEATTIE; REV. SUE BROWNING; REV. JIM BUNDY; REV. MARK BYRD; REV. STEVEN C. CLUNN; REV. DR. JOHN COPERHAVER; RABBI GARY CREDITOR; REV. DAVID ENSIGN; REV. HENRY FAIRMAN; RABBI JESSE GALLOP; REV. TOM GERSTENLAUER; REV. ROBIN H. GORSLINE; REV. TRISH HALL; REV. WARREN HAMMONDS; REV. JON HEASLET; REV. DOUGLAS HODGES; REV. PHYLLIS HUBBELL; REV. STEPHEN G. HYDE; REV. JANET JAMES; REV. JOHN MANWELL; REV. JAMES W. MCNEAL; REV. MARC BOSWELL; REV. ANDREW CLIVE MILLARD; REV. DR. MELANIE MILLER; REV. AMBER NEUROTH; REV. JAMES PAPILE; REV. LINDA OLSON PEEBLES; REV. DON PRANGE; RABBI MICHAEL RAGOZIN; RABBI BEN ROMER; REV. JENNIFER RYU; REV. ANYA SAMMLER-MICHAEL; REV. AMY SCHWARTZMAN; REV. DANNY SPEARS; REV. MARK SURIANO; REV. ROB VAUGHN; REV. DANIEL VELEZ-RIVERA; REV. KATE R. WALKER; REV. TERRYE WILLIAMS; REV. DR. KAREN-MARIE YUST,

Amici Supporting Appellees.

---

Appeals from the United States District Court for the Eastern District of Virginia, at Norfolk. Arenda L. Wright Allen, District Judge. (2:13-cv-00395-AWA-LRL)

---

Argued: May 13, 2014                         Decided: July 28, 2014

---

Before NIEMEYER, GREGORY, and FLOYD, Circuit Judges.

---

12

Affirmed by published opinion. Judge Floyd wrote the majority opinion, in which Judge Gregory joined. Judge Niemeyer wrote a separate dissenting opinion.

---

**ARGUED**: David Brandt Oakley, POOLE MAHONEY PC, Chesapeake, Virginia; David Austin Robert Nimocks, ALLIANCE DEFENDING FREEDOM, Washington, D.C., for Appellants George E. Schaefer, III and Michèle McQuigg. Stuart Alan Raphael, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellant Janet M. Rainey. Theodore B. Olson, GIBSON, DUNN & CRUTCHER, LLP, Washington, D.C., for Appellees. James D. Esseks, AMERICAN CIVIL LIBERTIES UNION, New York, New York, for Intervenors. **ON BRIEF**: Jeffrey F. Brooke, POOLE MAHONEY PC, Chesapeake, Virginia, for Appellant George E. Schaefer, III. Byron J. Babione, Kenneth J. Connelly, J. Caleb Dalton, ALLIANCE DEFENDING FREEDOM, Scottsdale, Arizona, for Appellant Michèle B. McQuigg. Mark R. Herring, Attorney General, Cynthia E. Hudson, Chief Deputy Attorney General, Rhodes B. Ritenour, Deputy Attorney General, Allyson K. Tysinger, Senior Assistant Attorney General, Catherine Crooks Hill, Senior Assistant Attorney General, Trevor S. Cox, Deputy Solicitor General, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellant Janet M. Rainey. David Boies, Armonk, New York, William A. Isaacson, Washington, D.C., Jeremy M. Goldman, Oakland, California, Robert Silver, Joshua I. Schiller, BOIES, SCHILLER & FLEXNER LLP, New York, New York; Theodore J. Boutrous, Jr., Joshua S. Lipshutz, GIBSON, DUNN & CRUTCHER LLP, Los Angeles, California; Thomas B. Shuttleworth, Robert E. Ruloff, Charles B. Lustig, Andrew M. Hendrick, Erik C. Porcaro, SHUTTLEWORTH, RULOFF, SWAIN, HADDAD & MORECOCK, P.C., Virginia Beach, Virginia, for Appellees. Rebecca K. Glenberg, AMERICAN CIVIL LIBERTIES UNION OF VIRGINIA FOUNDATION, INC., Richmond, Virginia; Joshua A. Block, AMERICAN CIVIL LIBERTIES UNION FOUNDATION, New York, New York; Gregory R. Nevins, Tara L. Borelli, LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC., Atlanta, Georgia; Paul M. Smith, Luke C. Platzer, Mark P. Gaber, JENNER & BLOCK LLP, Washington, D.C., for Intervenors. David A. Robinson, North Haven, Connecticut, as Amicus. Lynn D. Wardle, BRIGHAM YOUNG UNIVERSITY LAW SCHOOL, Provo, Utah; William C. Duncan, MARRIAGE LAW FOUNDATION, Lehi, Utah, for Amici Alan J. Hawkins and Jason S. Carroll. Deborah J. Dewart, DEBORAH J. DEWART, ATTORNEY AT LAW, Swansboro, North Carolina, for Amici North Carolina Values Coalition and Liberty, Life, and Law Foundation. Steve C. Taylor, ALLIANCE LEGAL GROUP, Chesapeake, Virginia, for Amicus Social Science Professors. Paul Benjamin

Linton, Northbrook, Illinois, for Amicus Family Research Council. John C. Eastman, Anthony T. Caso, Center for Constitutional Jurisprudence, CHAPMAN UNIVERSITY DALE E. FOWLER SCHOOL OF LAW, Orange, California, for Amici Virginia Catholic Conference, LLC and Center for Constitutional Jurisprudence. Patrick Morrisey, Attorney General, Julie Marie Blake, Assistant Attorney General, Elbert Lin, Solicitor General, OFFICE OF THE WEST VIRGINIA ATTORNEY GENERAL, Charleston, West Virginia, for Amicus State of West Virginia. D. John Sauer, St. Louis, Missouri, for Amicus Institute for Marriage and Public Policy. Henry P. Wall, Columbia, South Carolina, for Amicus Helen M. Alvare. Gregory F. Zoeller, Attorney General, Thomas M. Fisher, Solicitor General, OFFICE OF THE ATTORNEY GENERAL, Indianapolis, Indiana; Luther Strange, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF ALABAMA, Montgomery, Alabama; Michael C. Geraghty, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF ALASKA, Juneau, Alaska; Thomas C. Horne, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF ARIZONA, Phoenix, Arizona; John Suthers, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF COLORADO, Denver, Colorado; Lawrence G. Wasden, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF IDAHO, Boise, Idaho; James D. "Buddy" Caldwell, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF LOUISIANA, Baton Rouge, Louisiana; Timothy C. Fox, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MONTANA, Helena, Montana; Jon Bruning, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF NEBRASKA, Lincoln, Nebraska; E. Scott Pruitt, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF OKLAHOMA, Oklahoma City, Oklahoma; Alan Wilson, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF SOUTH CAROLINA, Columbia, South Carolina; Marty J. Jackley, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF SOUTH DAKOTA, Pierre, South Dakota; Sean Reyes, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF THE STATE OF UTAH, Salt Lake City, Utah; Peter K. Michael, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF WYOMING, Cheyenne, Wyoming, for Amici States of Indiana, Alabama, Alaska, Arizona, Colorado, Idaho, Louisiana, Montana, Nebraska, Oklahoma, South Carolina, South Dakota, Utah, and Wyoming. Stephen M. Crampton, Mary E. McAlister, LIBERTY COUNSEL, Lynchburg, Virginia, for Amicus WallBuilders, LLC. Mathew D. Staver, Anita L. Staver, LIBERTY COUNSEL, Orlando, Florida, for Amici Liberty Counsel and American College of Pediatricians. Frank D. Mylar, MYLAR LAW, P.C., Salt Lake City, Utah, for Amici Scholars of History and Related Disciplines and American Leadership Fund. Michael F. Smith, THE SMITH APPELLATE LAW FIRM, Washington, D.C., for Amici Robert P. George, Sherif Girgis, and Ryan T. Anderson. Gerard V. Bradley, NOTRE DAME LAW SCHOOL, Notre Dame, Indiana; Kevin T. Snider, PACIFIC JUSTICE

14

INSTITUTE, Oakland, California, for Amicus Paul McHugh. Anthony R. Picarello, Jr., U.S. CONFERENCE OF CATHOLIC BISHOPS, Washington, D.C.; R. Shawn Gunnarson, KIRTON MCCONKIE, Salt Lake City, Utah, for Amici United States Conference of Catholic Bishops, National Association of Evangelicals, Church of Jesus Christ of Latter-Day Saints, The Ethics & Religious Liberty Commission of the Southern Baptist Convention, and Lutheran Church-Missouri Synod. Eric Rassbach, Asma Uddin, THE BECKET FUND FOR RELIGIOUS LIBERTY, Washington, D.C., for Amicus The Becket Fund for Religious Liberty. Lawrence J. Joseph, Washington, D.C. for Amicus Eagle Forum Education and Legal Defense Fund. David Boyle, Long Beach, California, as Amicus. David Boyle, Long Beach, California, for Amicus Robert Oscar Lopez. Abbe David Lowell, Christopher D. Man, CHADBOURNE & PARKE LLP, Washington, D.C., for Amici Outserve-SLDN and The American Military Partner Association. Geoffrey R. Stone, THE UNIVERSITY OF CHICAGO LAW SCHOOL, Chicago, Illinois; Lori Alvino McGill, LATHAM & WATKINS LLP, Washington, D.C., for Amici Constitutional Law Scholars Ashutosh Bhagwat, Lee Bollinger, Erwin Chemerinsky, Walter Dellinger, Michael C. Dorf, Lee Epstein, Daniel Farber, Barry Friedman, Michael J. Gerhardt, Deborah Hellman, John C. Jeffries, Jr., Lawrence Lessig, William Marshall, Frank Michelman, Jane S. Schacter, Christopher H. Schroeder, Suzanna Sherry, Geoffrey R. Stone, David Strauss, Laurence H. Tribe, and William Van Alstyne. Steven W. Fitschen, THE NATIONAL LEGAL FOUNDATION, Virginia Beach, Virginia; Holly L. Carmichael, San Jose, California, for Amicus Concerned Women for America. Carmine D. Boccuzzi, Jr., Mark A. Lightner, Andra Troy, Andrew P. Meiser, CLEARY GOTTLIEB STEEN & HAMILTON LLP, New York, New York, for Amicus The American Sociological Association. L. Steven Emmert, SYKES, BOURDON, AHERN & LEVY, P.C., Virginia Beach, Virginia, for Amicus Virginia Constitutional Law Professors. Nathalie F.P. Gilfoyle, AMERICAN PSYCHOLOGICAL ASSOCIATION, Washington, D.C.; Bruce V. Spiva, THE SPIVA LAW FIRM PLLC, Washington, D.C., for Amici American Psychological Association, American Academy of Pediatrics, American Psychiatric Association, National Association of Social Workers, and Virginia Psychological Association. Mark Kleinschmidt, TIN FULTON WALKER & OWEN, Chapel Hill, North Carolina; Ryan T. Butler, Greensboro, North Carolina, for Amici Equality NC and South Carolina Equality Coalition. Rose A. Saxe, James D. Esseks, AMERICAN CIVIL LIBERTIES UNION FOUNDATION, New York, New York; Garrard R. Beeney, David A. Castleman, Catherine M. Bradley, W. Rudolph Kleysteuber, SULLIVAN & CROMWELL LLP, New York, New York, for Amici Marcie and Chantelle Fisher-Borne, Crystal Hendrix and Leigh Smith, Shana Carignan and Megan Parker, Terri Beck and Leslie Zanaglio,

15

Lee Knight Caffery and Dana Draa, Shawn Long and Craig Johnson, and Esmeralda Mejia and Christina Ginter-Mejia. Elizabeth B. Wydra, Douglas T. Kendall, Judith E. Schaeffer, David H. Gans, CONSTITUTIONAL ACCOUNTABILITY CENTER, Washington, D.C.; Ilya Shapiro, CATO INSTITUTE, Washington, D.C., for Amici Cato Institute and Constitutional Accountability Center. Daniel McNeel Lane, Jr., Matthew E. Pepping, San Antonio, Texas, Jessica M. Weisel, AKIN GUMP STRAUSS HAUER & FELD LLP, Los Angeles, California, for Amici Historians of Marriage Peter W. Bardaglio, Norma Basch, Stephanie Coontz, Nancy F. Cott, Toby L. Ditz, Ariela R. Dubler, Laura F. Edwards, Sarah Barringer Gordon, Michael Grossberg, Hendrik Hartog, Ellen Herman, Martha Hodes, Linda K. Kerber, Alice Kessler-Harris, Elaine Tyler May, Serena Mayeri, Steve Mintz, Elizabeth Pleck, Carole Shammas, Mary L. Shanley, Amy Dru Stanley, and Barbara Welke. Jiyun Cameron Lee, Andrew J. Davis, FOLGER LEVIN LLP, San Francisco, California, for Amicus Parents, Families and Friends of Lesbians and Gays, Inc. Rita F. Lin, Laura W. Weissbein, Sara Bartel, MORRISON & FOERSTER LLP, San Francisco, California, for Amici Kerry Abrams, Albert Clark Tate, Jr. Professor of Law University of Virginia School of Law, Vivian Hamilton, Professor of Law William and Mary, Meredith Harbach, Professor of Law University of Richmond, Joan Heifetz Hollinger, John and Elizabeth Boalt Lecturer in Residence University of California, Berkeley School of Law, Courtney G. Joslin, Professor of Law University of California, Davis School of Law, and Forty-Four Other Family Law Professors. Sherrilyn Ifill, Christina A. Swarns, Ria Tabacco Mar, NAACP LEGAL DEFENSE & EDUCATIONAL FUND, INC., New York, New York; Kim M. Keenan, NAACP, Baltimore, Maryland, for Amici NAACP Legal Defense & Educational Fund, Inc. and National Association for the Advancement of Colored People. Aderson Bellegarde Francois, HOWARD UNIVERSITY SCHOOL OF LAW CIVIL RIGHTS CLINIC, Washington, D.C.; Brad W. Seiling, Benjamin G. Shatz, MANATT, PHELPS & PHILLIPS, LLP, Los Angeles, California, for Amicus Howard University School of Law Civil Rights Clinic. Alec W. Farr, Washington, D.C., Tracy M. Talbot, Katherine Keating, BRYAN CAVE LLP, San Francisco, California, for Amici Family Equality Council and COLAGE. Nicholas M. O'Donnell, SULLIVAN & WORCESTER LLP, Boston, Massachusetts, for Amicus GLMA: Health Professionals Advancing LGBT Equality. Kathleen M. O'Sullivan, Mica D. Simpson, PERKINS COIE LLP, Seattle, Washington, for Amici William N. Eskridge, Jr., Rebecca L. Brown, Daniel A. Farber, Michael Gerhardt, Jack Knight, Andrew Koppelman, Melissa Lamb Saunders, Neil S. Siegel, and Jana B. Singer. Catherine E. Stetson, Erica Knievel Songer, Mary Helen Wimberly, Katie D. Fairchild, Madeline H. Gitomer, HOGAN LOVELLS US LLP, Washington, D.C., for Amicus Historians of Antigay

16

Discrimination. Rocky C. Tsai, Samuel P. Bickett, Rebecca Harlow, ROPES & GRAY LLP, San Francisco, California; Steven M. Freeman, Seth M. Marnin, Melissa Garlick, ANTI-DEFAMATION LEAGUE, New York, New York, for Amici Anti-Defamation League, Americans United for Separation of Church and State, Bend the Arc: A Jewish Partnership for Justice, Hadassah, The Women's Zionist Organization of America, Hindu American Foundation, The Interfaith Alliance Foundation, Japanese American Citizens League, Jewish Social Policy Action Network, Keshet, Metropolitan Community Churches, More Light Presbyterians, The National Council of Jewish Women, Nehirim, People For the American Way Foundation, Presbyterian Welcome, Reconcilingworks: Lutherans for Full Participation, Religious Institute, Inc., Sikh American Legal Defense and Education Fund, Society for Humanistic Judaism, T'Ruah: The Rabbinic Call for Human Rights, and Women's League For Conservative Judaism. Matthew P. McGuire, Beverlee E. Silva, Diane S. Wizig, ALSTON & BIRD LLP, Durham, North Carolina; Suzanne B. Goldberg, Sexuality and Gender Law Clinic, COLUMBIA LAW SCHOOL, New York, New York, for Amicus Columbia Law School Sexuality and Gender Law Clinic. Jeffrey S. Trachtman, Norman C. Simon, Jason M. Moff, Kurt M. Denk, Jessica N. Witte, KRAMER LEVIN NAFTALIS & FRANKEL LLP, New York, New York, for Amici Bishops of the Episcopal Church in Virginia, The Central Atlantic Conference of the United Church of Christ, Central Conference of American Rabbis, Mormons for Equality, Reconstructionist Rabbinical Association, Reconstructionist Rabbinical College and Jewish Reconstructionist Communities, Union for Reform Judaism, The Unitarian Universalist Association, Affirmation, Covenant Network of Presbyterians, Methodist Federation for Social Action, More Light Presbyterians, Presbyterian Welcome, Reconciling Ministries Network, Reconsilingworks: Lutherans For Full Participation, Religious Institute, Inc., and Women of Reform Judaism. Susan Baker Manning, Michael L. Whitlock, Margaret E. Sheer, Jared A. Craft, Sara M. Carian, Jessica C. Brooks, Katherine R. Moskop, John A. Polito, Stephanie Schuster, BINGHAM MCCUTCHEN LLP, Washington, D.C., for Amicus 28 Employers and Organizations Representing Employers. Martha Coakley, Attorney General, Jonathan B. Miller, Assistant Attorney General, Genevieve C. Nadeau, Assistant Attorney General, Michelle L. Leung, Assistant Attorney General, Frederick D. Augenstern, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL OF THE COMMONWEALTH OF MASSACHUSETTS, Boston, Massachusetts; Kamala D. Harris, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF CALIFORNIA, Sacramento, California; George Jepsen, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF CONNECTICUT, Hartford, Connecticut; Irvin B. Nathan, Attorney

General, OFFICE OF THE ATTORNEY GENERAL FOR THE DISTRICT OF COLUMBIA, Washington, D.C.; Lisa Madigan, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF ILLINOIS, Chicago, Illinois; Tom Miller, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF IOWA, Des Moines, Iowa; Janet T. Mills, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MAINE, Augusta, Maine; Douglas F. Gansler, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland; Joseph A. Foster, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF NEW HAMPSHIRE, Concord, New Hampshire; Gary K. King, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF NEW MEXICO, Santa Fe, New Mexico; Eric T. Schneiderman, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF NEW YORK, New York, New York; Ellen F. Rosenblum, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF OREGON, Salem, Oregon; William H. Sorrell, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF VERMONT, Montpelier, Vermont; Robert W. Ferguson, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF WASHINGTON, Olympia, Washington, for Amici Massachusetts, California, Connecticut, District of Columbia, Illinois, Iowa, Maine, Maryland, New Hampshire, New Mexico, New York, Oregon, Vermont, and Washington. Brad W. Seiling, Benjamin G. Shatz, MANATT, PHELPS & PHILLIPS, LLP, Los Angeles, California, for Amicus Gary J. Gates. Bruce A. Wessel, Moez M. Kaba, C. Mitchell Hendy, Brian Eggleston, IRELL & MANELLA LLP, Los Angeles, California, for Amicus National and Western States Women's Rights Organizations. Donald K. Butler, BATZLI STILES BUTLER, P.C., Richmond, Virginia; Susan M. Butler, SHOUNBACH, P.C., Fairfax, Virginia; Daniel L. Gray, Stephanie J. Smith, Kristen L. Kugel, Anne B. Robinson, COOPER GINSBERG GRAY, PLLC, Fairfax, Virginia, for Amicus Virginia Chapter of The American Academy of Matrimonial Lawyers. Marcia D. Greenberger, Emily J. Martin, Cortelyou C. Kenney, NATIONAL WOMEN'S LAW CENTER, Washington, D.C., for Amici The National Women's Law Center, Equal Rights Advocates, Legal Momentum, National Association of Women Lawyers, National Partnership for Women & Families, Southwest Women's Law Center, Women's Law Project, and Professors of Law Associated with The Williams Institute. Jerome C. Roth, Nicole S. Phillis, MUNGER, TOLLES & OLSON LLP, San Francisco, California, for Amicus Bay Area Lawyers for Individual Freedom. Shannon P. Minter, Christopher F. Stoll, Jaime Huling Delaye, NATIONAL CENTER FOR LESBIAN RIGHTS, Washington, D.C., for Amici Leadership Conference on Civil and Human Rights, Public Interest Organizations, and Bar Associations. Joanna L. Grossman, HOFSTRA LAW SCHOOL, Hempstead, New York; Marjory A. Gentry, ARNOLD & PORTER LLP, San Francisco, California, for Amicus Family Law and Conflict of Laws Professors. Mark C. Fleming, Felicia H. Ellsworth, Boston,

18

Massachusetts, Paul R.Q. Wolfson, Dina B. Mishra, Leah M. Litman, Washington, D.C., Alan Schoenfeld, WILMER CUTLER PICKERING HALE AND DORR LLP, New York, New York, for Amicus Gay & Lesbian Advocates & Defenders. John Humphrey, THE HUMPHREY LAW FIRM, Alexandria, Virginia, for Amici People of Faith For Equality in Virginia (POFEV), Celebration Center for Spiritual Living, Clarendon Presbyterian Church, Commonwealth Baptist Church, Congregation or AMI, Hope United Church of Christ, Little River UCC, Metropolitan Community Church of Northern Virginia, Mt. Vernon Unitarian Church, St. James UCC, St. John's UCC, New Life Metropolitan Community Church, Unitarian Universalist Fellowship of the Peninsula, Unitarian Universalist Congregation of Sterling, United Church of Christ of Fredericksburg, Unitarian Universalist Church of Loudoun, Rev. Marie Hulm Adam, Rev. Marty Anderson, Rev. Robin Anderson, Rev. Verne Arens, Rabbi Lia Bass, Rev. Joseph G. Beattie, Rev. Marc Boswell, Rev. Sue Browning, Rev. Jim Bundy, Rev. Mark Byrd, Rev. Steven C. Clunn, Rev. Dr. John Coperhaver, Rabbi Gary Creditor, Rev. David Ensign, Rev. Henry Fairman, Rabbi Jesse Gallop, Rev. Tom Gerstenlauer, Rev. Dr. Robin H. Gorsline, Rev. Trish Hall, Rev. Warren Hammonds, Rev. Jon Heaslet, Rev. Douglas Hodges, Rev. Phyllis Hubbell, Rev. Stephen G. Hyde, Rev. Janet James, Rev. John Manwell, Rev. James W. McNeal, Andrew Mertz, Rev. Andrew Clive Millard, Rev. Dr. Melanie Miller, Rev. Amber Neuroth, Rev. James Papile, Rev. Linda Olson Peebles, Rev. Don Prange, Rabbi Michael Ragozin, Rabbi Ben Romer, Rev. Jennifer Ryu, Rev. Anya Sammler-Michael, Rabbi Amy Schwartzman, Rev. Danny Spears, Rev. Mark Suriano, Rev. Rob Vaughn, Rev. Daniel Velez-Rivera, Rev. Kate R. Walker, Rev. Terrye Williams, and Rev. Dr. Karen-Marie Yust.

———————

FLOYD, Circuit Judge:

Via various state statutes and a state constitutional amendment, Virginia prevents same-sex couples from marrying and refuses to recognize same-sex marriages performed elsewhere. Two same-sex couples filed suit to challenge the constitutionality of these laws, alleging that they violate the Due Process and Equal Protection Clauses of the Fourteenth Amendment. The district court granted the couples' motion for summary judgment and enjoined Virginia from enforcing the laws. This appeal followed. Because we conclude that Virginia's same-sex marriage bans impermissibly infringe on its citizens' fundamental right to marry, we affirm.

I.

A.

This case concerns a series of statutory and constitutional mechanisms that Virginia employed to prohibit legal recognition for same-sex relationships in that state.[1] Virginia enacted the

---

[1] Three other states in this Circuit have similar bans: North Carolina, N.C. Const. art. XIV, § 6; N.C. Gen. Stat. §§ 51-1, 51-1.2; South Carolina, S.C. Const. art. XVII, § 15; S.C. Code Ann. §§ 20-1-10, 20-1-15; and West Virginia, W. Va. Code § 48-2-603. The Southern District of West Virginia has stayed a challenge to West Virginia's statute pending our resolution of this appeal. McGee v. Cole, No. 3:13-cv-24068 (S.D. W. Va. June 10, 2014) (order directing stay).

first of these laws in 1975: Virginia Code section 20-45.2, which provides that "marriage between persons of the same sex is prohibited." After the Supreme Court of Hawaii took steps to legalize same-sex marriage in the mid-1990s, Virginia amended section 20-45.2 to specify that "[a]ny marriage entered into by persons of the same sex in another state or jurisdiction shall be void in all respects in Virginia and any contractual rights created by such marriage shall be void and unenforceable." In 2004, Virginia added civil unions and similar arrangements to the list of prohibited same-sex relationships via the Affirmation of Marriage Act. See Va. Code Ann. § 20-45.3.

Virginia's efforts to ban same-sex marriage and other legally recognized same-sex relationships culminated in the Marshall/Newman Amendment to the Virginia Constitution:

> That only a union between one man and one woman may be a marriage valid in or recognized by this Commonwealth and its political subdivisions.
>
> This Commonwealth and its political subdivisions shall not create or recognize a legal status for relationships of unmarried individuals that intends to approximate the design, qualities, significance, or effects of marriage. Nor shall this Commonwealth or its political subdivisions create or recognize another union, partnership, or other legal status to which is assigned the rights, benefits, obligations, qualities, or effects of marriage.

Va. Const. art. I, § 15-A. The Virginia Constitution imposes two hurdles that a potential amendment must jump before becoming law: the General Assembly must approve the amendment in two

21

separate legislative sessions, and the people must ratify it. Va. Const. art. XII, § 1. The General Assembly approved the Marshall/Newman Amendment in 2005 and 2006. In November 2006, Virginia's voters ratified it by a vote of fifty-seven percent to forty-three percent. In the aggregate, Virginia Code sections 20-45.2 and 20-45.3 and the Marshall/Newman Amendment prohibit same-sex marriage, ban other legally recognized same-sex relationships, and render same-sex marriages performed elsewhere legally meaningless under Virginia state law.

## B.

Same-sex couples Timothy B. Bostic and Tony C. London and Carol Schall and Mary Townley (collectively, the Plaintiffs) brought this lawsuit to challenge the constitutionality of Virginia Code sections 20-45.2 and 20-45.3, the Marshall/Newman Amendment, and "any other Virginia law that bars same-sex marriage or prohibits the State's recognition of otherwise-lawful same-sex marriages from other jurisdictions" (collectively, the Virginia Marriage Laws). The Plaintiffs claim that the "inability to marry or have their relationship recognized by the Commonwealth of Virginia with the dignity and respect accorded to married opposite-sex couples has caused them significant hardship . . . and severe humiliation, emotional distress, pain, suffering, psychological harm, and stigma."

22

Bostic and London have been in a long-term, committed relationship with each other since 1989 and have lived together for more than twenty years. They "desire to marry each other under the laws of the Commonwealth in order to publicly announce their commitment to one another and to enjoy the rights, privileges, and protections that the State confers on married couples." On July 1, 2013, Bostic and London applied for a marriage license from the Clerk for the Circuit Court for the City of Norfolk. The Clerk denied their application because they are both men.

Schall and Townley are women who have been a couple since 1985 and have lived together as a family for nearly thirty years. They were lawfully married in California in 2008. In 1998, Townley gave birth to the couple's daughter, E. S.-T. Schall and Townley identify a host of consequences of their inability to marry in Virginia and Virginia's refusal to recognize their California marriage, including the following:

- Schall could not visit Townley in the hospital for several hours when Townley was admitted due to pregnancy-related complications.

- Schall cannot legally adopt E. S.-T., which forced her to retain an attorney to petition for full joint legal and physical custody.

23

- Virginia will not list both Schall and Townley as E. S.-T.'s parents on her birth certificate.

- Until February 2013, Schall and Townley could not cover one another on their employer-provided health insurance. Townley has been able to cover Schall on her insurance since then, but, unlike an opposite-sex spouse, Schall must pay state income taxes on the benefits she receives.

- Schall and Townley must pay state taxes on benefits paid pursuant to employee benefits plans in the event of one of their deaths.

- Schall and Townley cannot file joint state income tax returns, which has cost them thousands of dollars.

On July 18, 2013, Bostic and London sued former Governor Robert F. McDonnell, former Attorney General Kenneth T. Cuccinelli, and George E. Schaefer, III, in his official capacity as the Clerk for the Circuit Court for the City of Norfolk. The Plaintiffs filed their First Amended Complaint on September 3, 2013. The First Amended Complaint added Schall and Townley as plaintiffs, removed McDonnell and Cuccinelli as defendants, and added Janet M. Rainey as a defendant in her official capacity as the State Registrar of Vital Records. The Plaintiffs allege that the Virginia Marriage Laws are facially invalid under the Due Process and Equal Protection Clauses of

24

the Fourteenth Amendment and that Schaefer and Rainey violated 42 U.S.C. § 1983 by enforcing those laws.

The parties filed cross-motions for summary judgment. The Plaintiffs also requested a permanent injunction in connection with their motion for summary judgment and moved, in the alternative, for a preliminary injunction in the event that the district court denied their motion for summary judgment. The district court granted a motion by Michèle McQuigg—the Prince William County Clerk of Court—to intervene as a defendant on January 21, 2014. Two days later, new Attorney General Mark Herring—as Rainey's counsel—submitted a formal change in position and refused to defend the Virginia Marriage Laws, although Virginia continues to enforce them. McQuigg adopted Rainey's prior motion for summary judgment and the briefs in support of that motion.

The district court held that the Virginia Marriage Laws were unconstitutional on February 14, 2014. Bostic v. Rainey, 970 F. Supp. 2d 456, 483 (E.D. Va. 2014). It therefore denied Schaefer's and McQuigg's motions for summary judgment and granted the Plaintiffs' motion. The district court also enjoined Virginia's employees—including Rainey and her employees—and Schaefer, McQuigg, and their officers, agents, and employees from enforcing the Virginia Marriage Laws. Id. at

25

484. The court stayed the injunction pending our resolution of this appeal. Id.

Rainey, Schaefer, and McQuigg timely appealed the district court's decision. We have jurisdiction pursuant to 28 U.S.C. § 1291. On March 10, 2014, we allowed the plaintiffs from Harris v. Rainey—a similar case pending before Judge Michael Urbanski in the Western District of Virginia—to intervene. Judge Urbanski had previously certified that case as a class action on behalf of "all same-sex couples in Virginia who have not married in another jurisdiction" and "all same-sex couples in Virginia who have married in another jurisdiction," excluding the Plaintiffs. Harris v. Rainey, No. 5:13-cv-077, 2014 WL 352188, at *1, 12 (W.D. Va. Jan. 31, 2014).

Our analysis proceeds in three steps. First, we consider whether the Plaintiffs possess standing to bring their claims. Second, we evaluate whether the Supreme Court's summary dismissal of a similar lawsuit in Baker v. Nelson, 409 U.S. 810 (1972) (mem.), remains binding. Third, we determine which level of constitutional scrutiny applies here and test the Virginia Marriage Laws using the appropriate standard. For purposes of this opinion, we adopt the terminology the district court used to describe the parties in this case. The Plaintiffs, Rainey, and the Harris class are the "Opponents" of the Virginia Marriage Laws. Schaefer and McQuigg are the "Proponents."

26

Before we turn to the merits of the parties' arguments in this case, we consider Schaefer's contention that "[t]he trial court erred as a matter of law when it found all Plaintiffs had standing and asserted claims against all Defendants." We review the district court's disposition of cross-motions for summary judgment—including its determinations regarding standing—de novo, viewing the facts in the light most favorable to the non-moving party. Libertarian Party of Va. v. Judd, 718 F.3d 308, 313 (4th Cir. 2013); Covenant Media of S.C., LLC v. City of N. Charleston, 493 F.3d 421, 427-28 (4th Cir. 2007). Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Libertarian Party of Va., 718 F.3d at 313-14 (quoting Fed. R. Civ. P. 56(a)).

To establish standing under Article III of the Constitution, a plaintiff must "allege (1) an injury that is (2) fairly traceable to the defendant's allegedly unlawful conduct and that is (3) likely to be redressed by the requested relief." Lujan v. Defenders of Wildlife, 504 U.S. 555, 590 (1992) (quoting Allen v. Wright, 468 U.S. 737, 751 (1984)) (internal quotation marks omitted). The standing requirement applies to each claim that a plaintiff seeks to press. DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 352 (2006).

27

Schaefer premises his argument that the Plaintiffs lack standing to bring their claims on the idea that every plaintiff must have standing as to every defendant. However, the Supreme Court has made it clear that "the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." Rumsfeld v. Forum for Academic & Institutional Rights, Inc., 547 U.S. 47, 52 n.2 (2006); see also Dep't of Commerce v. U.S. House of Representatives, 525 U.S. 316, 330 (1999) (holding that a case is justiciable if some, but not necessarily all, of the plaintiffs have standing as to a particular defendant); Vill. of Arlington Heights v. Metro. Housing Dev. Corp., 429 U.S. 252, 263-64 (1977) (same). The Plaintiffs' claims can therefore survive Schaefer's standing challenge as long as one couple satisfies the standing requirements with respect to each defendant.

Schaefer serves as the Clerk for the Circuit Court for the City of Norfolk. In Virginia, circuit court clerks are responsible for issuing marriage licenses and filing records of marriage. Va. Code Ann. §§ 20-14, 32.1-267. Although Schall and Townley did not seek a marriage license from Schaefer, the district court found that Bostic and London did so and that Schaefer denied their request because they are a same-sex

couple.[2]  Bostic, 970 F. Supp. 2d at 462, 467.  This license denial constitutes an injury for standing purposes.  See S. Blasting Servs., Inc. v. Wilkes Cnty., 288 F.3d 584, 595 (4th Cir. 2002) (explaining that the plaintiffs had not suffered an injury because they had not applied for, or been denied, the permit in question); Scott v. Greenville Cnty., 716 F.2d 1409, 1414-15 & n.6 (4th Cir. 1983) (holding that denial of building permit constituted an injury).  Bostic and London can trace this denial to Schaefer's enforcement of the allegedly unconstitutional Virginia Marriage Laws,[3] and declaring those

---

[2] Schaefer contends that Schall and Townley cannot bring a § 1983 claim against him for the same reason:  he did not commit any act or omission that harmed them.  To bring a successful § 1983 claim, a plaintiff must show that "the alleged infringement of federal rights [is] 'fairly attributable to the state[.]'"  Rendell-Baker v. Kohn, 457 U.S. 830, 838 (1982) (quoting Lugar v. Edmondson Oil Co., 457 U.S. 922, 937 (1982)).  Schaefer's action in denying Bostic and London's application for a marriage license is clearly attributable to the state.  The district court could therefore entertain a § 1983 claim against Schaefer without ascertaining whether he committed any action with respect to Schall and Townley.

[3] For this reason, and contrary to Schaefer's assertions, Schaefer is also a proper defendant under Ex parte Young, 209 U.S. 123 (1908).  Pursuant to Ex parte Young, the Eleventh Amendment does not bar a citizen from suing a state officer to enjoin the enforcement of an unconstitutional law when the officer has "some connection with the enforcement of the act." Lytle v. Griffith, 240 F.3d 404, 412 (4th Cir. 2001) (emphasis omitted) (quoting Ex parte Young, 209 U.S. at 157).  Schaefer bears the requisite connection to the enforcement of the Virginia Marriage Laws due to his role in granting and denying applications for marriage licenses.

laws unconstitutional and enjoining their enforcement would redress Bostic and London's injuries. Bostic and London therefore possess Article III standing with respect to Schaefer. We consequently need not consider whether Schall and Townley have standing to sue Schaefer. See Horne v. Flores, 557 U.S. 433, 446-47 (2009) (declining to analyze whether additional plaintiffs had standing when one plaintiff did).

Rainey—as the Registrar of Vital Records—is tasked with developing Virginia's marriage license application form and distributing it to the circuit court clerks throughout Virginia. Va. Code Ann. §§ 32.1-252(A)(9), 32.1-267(E). Neither Schaefer's nor Rainey's response to the First Amended Complaint disputes its description of Rainey's duties:

> Defendant Rainey is responsible for ensuring compliance with the Commonwealth's laws relating to marriage in general and, more specifically, is responsible for enforcement of the specific provisions at issue in this Amended Complaint, namely those laws that limit marriage to opposite-sex couples and that refuse to honor the benefits of same-sex marriages lawfully entered into in other states.

In addition to performing these marriage-related functions, Rainey develops and distributes birth certificate forms, oversees the rules relating to birth certificates, and furnishes forms relating to adoption so that Virginia can collect the information necessary to prepare the adopted child's birth

certificate. Id. §§ 32.1-252(A)(2)-(3), (9), 32.1-257, 32.1-261(A)(1), 32.1-262, 32.1-269.

Rainey's promulgation of a marriage license application form that does not allow same-sex couples to obtain marriage licenses resulted in Schaefer's denial of Bostic and London's marriage license request. For the reasons we describe above, this license denial constitutes an injury. Bostic and London can trace this injury to Rainey due to her role in developing the marriage license application form in compliance with the Virginia Marriage Laws, and the relief they seek would redress their injuries. Bostic and London consequently have standing to sue Rainey.

Schall and Townley also possess standing to bring their claims against Rainey. They satisfy the injury requirement in two ways. First, in equal protection cases—such as this case—"[w]hen the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, . . . . [t]he 'injury in fact' . . . is the denial of equal treatment resulting from the imposition of the barrier[.]" Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, 508 U.S. 656, 666 (1993). The Virginia Marriage Laws erect such a barrier, which prevents same-sex couples from obtaining the emotional, social, and financial benefits that opposite-sex couples realize

31

upon marriage. Second, Schall and Townley allege that they have suffered stigmatic injuries due to their inability to get married in Virginia and Virginia's refusal to recognize their California marriage. Stigmatic injury stemming from discriminatory treatment is sufficient to satisfy standing's injury requirement if the plaintiff identifies "some concrete interest with respect to which [he or she] [is] personally subject to discriminatory treatment" and "[t]hat interest . . . independently satisf[ies] the causation requirement of standing doctrine." Allen, 468 U.S. at 757 n.22, abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, 134 S. Ct. 1377 (2014). Schall and Townley point to several concrete ways in which the Virginia Marriage Laws have resulted in discriminatory treatment. For example, they allege that their marital status has hindered Schall from visiting Townley in the hospital, prevented Schall from adopting E. S.-T.,[4] and subjected Schall and Townley to tax burdens from which married opposite-sex couples are exempt. Because Schall and Townley highlight specific, concrete instances of discrimination rather

---

[4] Virginia does not explicitly prohibit same-sex couples from adopting children. The Virginia Marriage Laws impose a functional ban on adoption by same-sex couples because the Virginia Code allows only married couples or unmarried individuals to adopt children. Va. Code Ann. § 63.2-1232(A)(6).

than making abstract allegations, their stigmatic injuries are legally cognizable.

Schall and Townley's injuries are traceable to Rainey's enforcement of the Virginia Marriage Laws. Because declaring the Virginia Marriage Laws unconstitutional and enjoining their enforcement would redress Schall and Townley's injuries, they satisfy standing doctrine's three requirements with respect to Rainey. In sum, each of the Plaintiffs has standing as to at least one defendant.

III.

Having resolved the threshold issue of whether the Plaintiffs have standing to sue Schaefer and Rainey, we now turn to the merits of the Opponents' Fourteenth Amendment arguments. We begin with the issue of whether the Supreme Court's summary dismissal in Baker v. Nelson settles this case. Baker came to the Supreme Court as an appeal from a Minnesota Supreme Court decision, which held that a state statute that the court interpreted to bar same-sex marriages did not violate the Fourteenth Amendment's Due Process or Equal Protection Clauses. Baker v. Nelson, 191 N.W.2d 185, 187 (Minn. 1971). At the time, 28 U.S.C. § 1257 required the Supreme Court to accept appeals of state supreme court cases involving constitutional challenges to state statutes, such as Baker. See Hicks v. Miranda, 422 U.S.

33

332, 344 (1975).  The Court dismissed the appeal in a one-sentence opinion "for want of a substantial federal question." Baker, 409 U.S. 810.

Summary dismissals qualify as "votes on the merits of a case."  Hicks, 422 U.S. at 344 (quoting Ohio ex rel. Eaton v. Price, 360 U.S. 246, 247 (1959)) (internal quotation marks omitted).  They therefore "prevent lower courts from coming to opposite conclusions on the precise issues presented and necessarily decided."  Mandel v. Bradley, 432 U.S. 173, 176 (1977) (per curiam).  However, the fact that Baker and the case at hand address the same precise issues does not end our inquiry.  Summary dismissals lose their binding force when "doctrinal developments" illustrate that the Supreme Court no longer views a question as unsubstantial, regardless of whether the Court explicitly overrules the case.  Hicks, 422 U.S. at 344 (quoting Port Auth. Bondholders Protective Comm. v. Port of N.Y. Auth., 387 F.2d 259, 263 n.3 (2d Cir. 1967)) (internal quotation marks omitted).  The district court determined that doctrinal developments stripped Baker of its status as binding precedent. Bostic, 970 F. Supp. 2d at 469-70.  Every federal court to consider this issue since the Supreme Court decided United States v. Windsor, 133 S. Ct. 2675 (2013), has reached the same conclusion.  See Bishop v. Smith, Nos. 14-5003, 14-5006, 2014 WL 3537847, at *6-7 (10th Cir. July 18, 2014); Kitchen v. Herbert,

34

No. 13-4178, 2014 WL 2868044, at *7-10 (10th Cir. June 25, 2014); Love v. Beshear, No. 3:13-cv-750-H, 2014 WL 2957671, *2-3 (W.D. Ky. July 1, 2014); Baskin v. Bogan, Nos. 1:14-cv-00355-RLY-TAB, 1:14-cv-00404-RLY-TAB, 2014 WL 2884868, at *4-6 (S.D. Ind. June 25, 2014); Wolf v. Walker, No. 14-cv-64-bbc, 2014 WL 2558444, at *4-6 (W.D. Wis. June 6, 2014); Whitewood v. Wolf, No. 1:13-cv-1861, 2014 WL 2058105, at *5-6 (M.D. Pa. May 20, 2014); Geiger v. Kitzhaber, Nos. 6:13-cv-01834-MC, 6:13-cv-02256-MC, 2014 WL 2054264, at *1 n.1 (D. Or. May 19, 2014); Latta v. Otter, No. 1:13-cv-00482-CWD, 2014 WL 1909999, at *8-9 (D. Idaho May 13, 2014); DeBoer v. Snyder, 973 F. Supp. 2d 757, 773 n.6 (E.D. Mich. 2014); De Leon v. Perry, 975 F. Supp. 2d 632, 647-49 (W.D. Tex. 2014); McGee v. Cole, No. 3:13-24068, 2014 WL 321122, at *8-10 (S.D. W. Va. Jan. 29, 2014).

Windsor concerned whether section 3 of the federal Defense of Marriage Act (DOMA) contravened the Constitution's due process and equal protection guarantees. Section 3 defined "marriage" and "spouse" as excluding same-sex couples when those terms appeared in federal statutes, regulations, and directives, rendering legally married same-sex couples ineligible for myriad federal benefits. 133 S. Ct. at 2683, 2694. When it decided the case below, the Second Circuit concluded that Baker was no longer precedential, Windsor v. United States, 699 F.3d 169, 178-79 (2d Cir. 2012), over the dissent's vigorous arguments to

35

the contrary, see id. at 192-95 (Straub, J., dissenting in part and concurring in part). Despite this dispute, the Supreme Court did not discuss Baker in its opinion or during oral argument.[5]

The Supreme Court's willingness to decide Windsor without mentioning Baker speaks volumes regarding whether Baker remains good law. The Court's development of its due process and equal protection jurisprudence in the four decades following Baker is even more instructive. On the Due Process front, Lawrence v. Texas, 539 U.S. 558 (2003), and Windsor are particularly relevant. In Lawrence, the Court recognized that the Due Process Clauses of the Fifth and Fourteenth Amendments "afford constitutional protection to personal decisions relating to marriage, procreation, contraception, family relationships, child rearing, and education. . . . Persons in a homosexual relationship may seek autonomy for these purposes, just as

---

[5] The constitutionality of a law that prohibited marriage from encompassing same-sex relationships was also at issue in Hollingsworth v. Perry, 133 S. Ct. 2652 (2013), a case that the Supreme Court ultimately decided on standing grounds. Although the petitioners' attorney attempted to invoke Baker during oral argument, Justice Ginsburg interjected: "Baker v. Nelson was 1971. The Supreme Court hadn't even decided that gender-based classifications get any kind of heightened scrutiny. . . . [S]ame-sex intimate conduct was considered criminal in many states in 1971, so I don't think we can extract much in Baker v. Nelson." Oral Argument at 11:33, Hollingsworth v. Perry, 133 S. Ct. 2652 (No. 12-144), available at 2013 WL 1212745.

36

heterosexual persons do." Id. at 574. These considerations led the Court to strike down a Texas statute that criminalized same-sex sodomy. Id. at 563, 578-79. The Windsor Court based its decision to invalidate section 3 of DOMA on the Fifth Amendment's Due Process Clause. The Court concluded that section 3 could not withstand constitutional scrutiny because "the principal purpose and the necessary effect of [section 3] are to demean those persons who are in a lawful same-sex marriage," who—like the unmarried same-sex couple in Lawrence—have a constitutional right to make "moral and sexual choices." 133 S. Ct. at 2694-95. These cases firmly position same-sex relationships within the ambit of the Due Process Clauses' protection.

The Court has also issued several major equal protection decisions since it decided Baker. The Court's opinions in Craig v. Boren, 429 U.S. 190 (1976), and Frontiero v. Richardson, 411 U.S. 677 (1973), identified sex-based classifications as quasi-suspect, causing them to warrant intermediate scrutiny rather than rational basis review, see Craig, 429 U.S. at 218 (Rehnquist, J., dissenting) (coining the term "intermediate level scrutiny" to describe the Court's test (internal quotation marks omitted)). Two decades later, in Romer v. Evans, the Supreme Court struck down a Colorado constitutional amendment that prohibited legislative, executive, and judicial action

aimed at protecting gay, lesbian, and bisexual individuals from discrimination. 517 U.S. 620, 624, 635 (1996). The Court concluded that the law violated the Fourteenth Amendment's Equal Protection Clause because "its sheer breadth is so discontinuous with the reasons offered for it that the amendment seems inexplicable by anything but animus toward the class it affects," causing the law to "lack[] a rational relationship to legitimate state interests." Id. at 632. Finally, the Supreme Court couched its decision in Windsor in both due process and equal protection terms. 133 S. Ct. at 2693, 2695. These cases demonstrate that, since Baker, the Court has meaningfully altered the way it views both sex and sexual orientation through the equal protection lens.

In light of the Supreme Court's apparent abandonment of Baker and the significant doctrinal developments that occurred after the Court issued its summary dismissal in that case, we decline to view Baker as binding precedent and proceed to the meat of the Opponents' Fourteenth Amendment arguments.

IV.

A.

Our analysis of the Opponents' Fourteenth Amendment claims has two components. First, we ascertain what level of constitutional scrutiny applies: either rational basis review

38

or some form of heightened scrutiny, such as strict scrutiny. Second, we apply the appropriate level of scrutiny to determine whether the Virginia Marriage Laws pass constitutional muster.

Under both the Due Process and Equal Protection Clauses, interference with a fundamental right warrants the application of strict scrutiny.[6]  Washington v. Glucksberg, 521 U.S. 702, 719-20 (1997); Zablocki v. Redhail, 434 U.S. 374, 383 (1978). We therefore begin by assessing whether the Virginia Marriage Laws infringe on a fundamental right.  Fundamental rights spring from the Fourteenth Amendment's protection of individual liberty, which the Supreme Court has described as "the right to define one's own concept of existence, of meaning, of the universe, and of the mystery of human life."  Planned Parenthood of Se. Pa. v. Casey, 505 U.S. 833, 851 (1992).  This liberty includes the fundamental right to marry.  Zablocki, 434 U.S. at 383; Loving v. Virginia, 388 U.S. 1, 12 (1967); see Griswold v.

---

[6] The Equal Protection Clause also dictates that some form of heightened scrutiny applies when a law discriminates based on a suspect or quasi-suspect classification, such as race or gender.  See City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 440-41 (1985); Mass. Bd. of Ret. v. Murgia, 427 U.S. 307, 313-14 (1976) (per curiam).  This Court previously declined to recognize sexual orientation as a suspect classification in Thomasson v. Perry, 80 F.3d 915, 928 (4th Cir. 1996) (en banc), and Veney v. Wyche, 293 F.3d 726, 731-32 (4th Cir. 2002). Because we conclude that the Virginia Marriage Laws warrant strict scrutiny due to their infringement of the fundamental right to marry, we need not reach the question of whether Thomasson and Veney remain good law.

Connecticut, 381 U.S. 479, 485-86 (1965) (placing the right to marry within the fundamental right to privacy); see also Skinner v. Oklahoma ex rel. Williamson, 316 U.S. 535, 541 (1942) (characterizing marriage as "one of the basic civil rights of man"); Maynard v. Hill, 125 U.S. 190, 205 (1888) (calling marriage "the most important relation in life" and "the foundation of the family and of society, without which there would be neither civilization nor progress").

The Opponents and Proponents agree that marriage is a fundamental right. They strongly disagree, however, regarding whether that right encompasses the right to same-sex marriage. The Opponents argue that the fundamental right to marry belongs to the individual, who enjoys the right to marry the person of his or her choice. By contrast, the Proponents point out that, traditionally, states have sanctioned only man-woman marriages. They contend that, in light of this history, the right to marry does not include a right to same-sex marriage.

Relying on Washington v. Glucksberg, the Proponents aver that the district court erred by not requiring "a careful description of the asserted fundamental liberty interest," 521 U.S. at 721 (internal quotation marks omitted), which they characterize as the right to "marriage to another person of the same sex," not the right to marry. In Glucksberg, the Supreme Court described the right at issue as "a right to commit suicide

40

with another's assistance." Id. at 724. The Court declined to categorize this right as a new fundamental right because it was not, "objectively, deeply rooted in this Nation's history and tradition." See id. at 720-21 (quoting Moore v. City of E. Cleveland, 431 U.S. 494, 503 (1977)) (internal quotation marks omitted). The Proponents urge us to reject the right to same-sex marriage for the same reason.

We do not dispute that states have refused to permit same-sex marriages for most of our country's history. However, this fact is irrelevant in this case because Glucksberg's analysis applies only when courts consider whether to recognize new fundamental rights. See id. at 720, 727 & n.19 (identifying the above process as a way of "expand[ing] the concept of substantive due process" beyond established fundamental rights, such as the right to marry (quoting Collins v. City of Harker Heights, 503 U.S. 115, 125 (1992)) (internal quotation marks omitted)). Because we conclude that the fundamental right to marry encompasses the right to same-sex marriage, Glucksberg's analysis is inapplicable here.

Over the decades, the Supreme Court has demonstrated that the right to marry is an expansive liberty interest that may stretch to accommodate changing societal norms. Perhaps most notably, in Loving v. Virginia, the Supreme Court invalidated a Virginia law that prohibited white individuals from marrying

41

individuals of other races. 388 U.S. at 4. The Court explained that "[t]he freedom to marry has long been recognized as one of the vital personal rights essential to the orderly pursuit of happiness by free men" and that no valid basis justified the Virginia law's infringement of that right. Id. at 12. Subsequently, in Zablocki v. Redhail, the Supreme Court considered the constitutionality of a Wisconsin statute that required people obligated to pay child support to obtain a court order granting permission to marry before they could receive a marriage license. 434 U.S. at 375, 383-84. The statute specified that a court should grant permission only to applicants who proved that they had complied with their child support obligations and demonstrated that their children were not likely to become "public charges." Id. at 375 (internal quotation marks omitted). The Court held that the statute impermissibly infringed on the right to marry. See id. at 390-91. Finally, in Turner v. Safley, the Court determined that a Missouri regulation that generally prohibited prison inmates from marrying was an unconstitutional breach of the right to marry. 482 U.S. 78, 82, 94-99 (1987).

These cases do not define the rights in question as "the right to interracial marriage," "the right of people owing child support to marry," and "the right of prison inmates to marry." Instead, they speak of a broad right to marry that is not

42

circumscribed based on the characteristics of the individuals seeking to exercise that right. The Supreme Court's unwillingness to constrain the right to marry to certain subspecies of marriage meshes with its conclusion that the right to marry is a matter of "freedom of choice," Zablocki, 434 U.S. at 387, that "resides with the individual," Loving, 388 U.S. at 12. If courts limited the right to marry to certain couplings, they would effectively create a list of legally preferred spouses, rendering the choice of whom to marry a hollow choice indeed.

The Proponents point out that Loving, Zablocki, and Turner each involved opposite-sex couples. They contend that, because the couples in those cases chose to enter opposite-sex marriages, we cannot use them to conclude that the Supreme Court would grant the same level of constitutional protection to the choice to marry a person of the same sex. However, the Supreme Court's decisions in Lawrence and Windsor suggest otherwise. In Lawrence, the Court expressly refused to narrowly define the right at issue as the right of "homosexuals to engage in sodomy," concluding that doing so would constitute a "failure to appreciate the extent of the liberty at stake." 539 U.S. at 566-67. Just as it has done in the right-to-marry arena, the Court identified the right at issue in Lawrence as a matter of choice, explaining that gay and lesbian individuals—like all

43

people—enjoy the right to make decisions regarding their personal relationships. Id. at 567. As we note above, the Court reiterated this theme in Windsor, in which it based its conclusion that section 3 of DOMA was unconstitutional, in part, on that provision's disrespect for the "moral and sexual choices" that accompany a same-sex couple's decision to marry. 133 S. Ct. at 2694. Lawrence and Windsor indicate that the choices that individuals make in the context of same-sex relationships enjoy the same constitutional protection as the choices accompanying opposite-sex relationships. We therefore have no reason to suspect that the Supreme Court would accord the choice to marry someone of the same sex any less respect than the choice to marry an opposite-sex individual who is of a different race, owes child support, or is imprisoned. Accordingly, we decline the Proponents' invitation to characterize the right at issue in this case as the right to same-sex marriage rather than simply the right to marry.

Of course, "[b]y reaffirming the fundamental character of the right to marry, we do not mean to suggest that every state regulation which relates in any way to the incidents of or prerequisites for marriage must be subjected to rigorous scrutiny." Zablocki, 434 U.S. at 386. Strict scrutiny applies only when laws "significantly interfere" with a fundamental right. See id. at 386-87. The Virginia Marriage Laws

44

unquestionably satisfy this requirement: they impede the right to marry by preventing same-sex couples from marrying and nullifying the legal import of their out-of-state marriages. Strict scrutiny therefore applies in this case.

B.

Under strict scrutiny, a law "may be justified only by compelling state interests, and must be narrowly drawn to express only those interests." Carey v. Population Servs. Int'l, 431 U.S. 678, 686 (1977). The Proponents bear the burden of demonstrating that the Virginia Marriage Laws satisfy this standard, see Fisher v. Univ. of Tex. at Austin, 133 S. Ct. 2411, 2420 (2013), and they must rely on the laws' "actual purpose[s]" rather than hypothetical justifications, see Shaw v. Hunt, 517 U.S. 899, 908 n.4 (1996). The Proponents[7] contend that five compelling interests undergird the Virginia Marriage Laws: (1) Virginia's federalism-based interest in maintaining control over the definition of marriage within its borders, (2) the history and tradition of opposite-sex marriage, (3) protecting the institution of marriage, (4) encouraging responsible

---

[7] Although some of these arguments appear only in McQuigg's briefs, we attribute them to the Proponents because Schaefer "reserved the right to adopt and incorporate in whole or in part" McQuigg's discussion of the rationales underlying the Virginia Marriage Laws.

45

procreation, and (5) promoting the optimal childrearing environment. We discuss each of these interests in turn.

## 1. Federalism

The Constitution does not grant the federal government any authority over domestic relations matters, such as marriage. Accordingly, throughout our country's history, states have enjoyed the freedom to define and regulate marriage as they see fit. See Windsor, 133 S. Ct. at 2691-92. States' control over marriage laws within their borders has resulted in some variation among states' requirements. For example, West Virginia prohibits first cousins from marrying, W. Va. Code § 48-2-302, but the remaining states in this Circuit allow first cousin marriage, see Md. Code Ann., Fam. Law § 2-202; N.C. Gen. Stat. § 51-3; S.C. Code Ann. § 20-1-10; Va. Code Ann. § 20-38.1. States' power to define and regulate marriage also accounts for their differing treatment of same-sex couples.

The Windsor decision rested in part on the Supreme Court's respect for states' supremacy in the domestic relations sphere.[8]

___

[8] In Windsor, the Court did not label the type of constitutional scrutiny it applied, leaving us unsure how the Court would fit its federalism discussion within a traditional heightened scrutiny or rational basis analysis. The lower courts have taken differing approaches, with some discussing Windsor and federalism as a threshold matter, see, e.g., Wolf, 2014 WL 2558444, at *8-12; Bishop v. United States ex rel.

46

The Court recognized that section 3 of DOMA upset the status quo by robbing states of their ability to define marriage. Although states could legalize same-sex marriage, they could not ensure that the incidents, benefits, and obligations of marriage would be uniform within their borders. See Windsor, 133 S. Ct. at 2692. However, the Court did not lament that section 3 had usurped states' authority over marriage due to its desire to safeguard federalism. Id. ("[T]he State's power in defining the marital relation is of central relevance in this case quite apart from the principles of federalism."). Its concern sprung from section 3's creation of two classes of married couples within states that had legalized same-sex marriage: opposite-sex couples, whose marriages the federal government recognized, and same-sex couples, whose marriages the federal government ignored. Id. The resulting injury to same-sex couples served as the foundation for the Court's conclusion that section 3 violated the Fifth Amendment's Due Process Clause. Id. at 2693.

---

Holder, 962 F. Supp. 2d 1252, 1277-79 (N.D. Okla. 2014); Kitchen v. Herbert, 961 F. Supp. 2d 1181, 1193-94 (D. Utah 2013), and others—such as the district court in this case—considering federalism as a state interest underlying the same-sex marriage bans at issue, see, e.g., Latta, 2014 WL 1909999, at *25-26; DeBoer, 973 F. Supp. 2d at 773-75; Bostic, 970 F. Supp. 2d at 475-77. Although we follow the district court's lead and situate our federalism discussion within our application of strict scrutiny, our conclusion would remain the same even if we selected an alternate organizational approach.

Citing Windsor, the Proponents urge us to view Virginia's federalism-based interest in defining marriage as a suitable justification for the Virginia Marriage Laws.  However, Windsor is actually detrimental to their position.  Although the Court emphasized states' traditional authority over marriage, it acknowledged that "[s]tate laws defining and regulating marriage, of course, must respect the constitutional rights of persons."  Id. at 2691 (citing Loving, 388 U.S. 1); see also id. at 2692 ("The States' interest in defining and regulating the marital relation[] [is] subject to constitutional guarantees.").  Windsor does not teach us that federalism principles can justify depriving individuals of their constitutional rights; it reiterates Loving's admonition that the states must exercise their authority without trampling constitutional guarantees. Virginia's federalism-based interest in defining marriage therefore cannot justify its encroachment on the fundamental right to marry.

The Supreme Court's recent decision in Schuette v. Coalition to Defend Affirmative Action, 134 S. Ct. 1623 (2014), does not change the conclusion that Windsor dictates.  In Schuette, the Court refused to strike down a voter-approved state constitutional amendment that barred public universities in Michigan from using race-based preferences as part of their admissions processes.  Id. at 1629, 1638.  The Court declined to

48

closely scrutinize the amendment because it was not "used, or . . . likely to be used, to encourage infliction of injury by reason of race."  See id. at 1638.  Instead, the Court dwelled on the need to respect the voters' policy choice, concluding that "[i]t is demeaning to the democratic process to presume that the voters are not capable of deciding an issue of this sensitivity on decent and rational grounds" and the judiciary's role was not to "disempower the voters from choosing which path to follow."  Id. at 1635-38.

The Proponents emphasize that Virginia's voters approved the Marshall/Newman Amendment.  Like the Michigan amendment at issue in Schuette, the Marshall/Newman Amendment is the codification of Virginians' policy choice in a legal arena that is fraught with intense social and political debate.  Americans' ability to speak with their votes is essential to our democracy. But the people's will is not an independent compelling interest that warrants depriving same-sex couples of their fundamental right to marry.

> The very purpose of a Bill of Rights[9] was to withdraw certain subjects from the vicissitudes of political

---

[9] Of course, the Fourteenth Amendment is not part of the Bill of Rights.  This excerpt from Barnette is nevertheless relevant here due to the Fourteenth Amendment's similar goal of protecting unpopular minorities from government overreaching, see Regents of Univ. of Cal. v. Bakke, 438 U.S. 265, 293 (1978), and its role in rendering the Bill of Rights applicable to the states, see Duncan v. Louisiana, 391 U.S. 145, 147-48 (1968).

49

controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts. One's right to life, liberty, and property, to free speech, a free press, freedom of worship and assembly, and other fundamental rights may not be submitted to vote; they depend on the outcome of no elections.

W. Va. State Bd. of Educ. v. Barnette, 319 U.S. 624, 638 (1943) (footnote added); see also Romer, 517 U.S. at 623 (invalidating a voter-approved amendment to Colorado's constitution); Lucas v. Forty-Fourth Gen. Assembly of Colo., 377 U.S. 713, 736-37 (1964) ("A citizen's constitutional rights can hardly be infringed simply because a majority of the people choose that it be."). Accordingly, neither Virginia's federalism-based interest in defining marriage nor our respect for the democratic process that codified that definition can excuse the Virginia Marriage Laws' infringement of the right to marry.

### 2. History and Tradition

The Proponents also point to the "history and tradition" of opposite-sex marriage as a compelling interest that supports the Virginia Marriage Laws. The Supreme Court has made it clear that, even under rational basis review, the "[a]ncient lineage of a legal concept does not give it immunity from attack." Heller v. Doe ex rel. Doe, 509 U.S. 312, 326 (1993). The closely linked interest of promoting moral principles is similarly infirm in light of Lawrence: "the fact that the

50

governing majority in a State has traditionally viewed a particular practice as immoral is not a sufficient reason for upholding a law prohibiting the practice; neither history nor tradition could save a law prohibiting miscegenation from constitutional attack." 539 U.S. at 577-78 (quoting Bowers v. Hardwick, 478 U.S. 186, 216 (1986) (Stevens, J., dissenting)) (internal quotation marks omitted); see also id. at 601 (Scalia, J., dissenting) ("But 'preserving the traditional institution of marriage' is just a kinder way of describing the State's moral disapproval of same-sex couples."). Preserving the historical and traditional status quo is therefore not a compelling interest that justifies the Virginia Marriage Laws.

### 3. Safeguarding the Institution of Marriage

In addition to arguing that history and tradition are compelling interests in their own rights, the Proponents warn that deviating from the tradition of opposite-sex marriage will destabilize the institution of marriage. The Proponents suggest that legalizing same-sex marriage will sever the link between marriage and procreation: they argue that, if same-sex couples—who cannot procreate naturally—are allowed to marry, the state will sanction the idea that marriage is a vehicle for adults' emotional fulfillment, not simply a framework for parenthood. According to the Proponents, if adults are the focal point of

51

marriage, "then no logical grounds reinforce stabilizing norms like sexual exclusivity, permanence, and monogamy," which exist to benefit children.

We recognize that, in some cases, we owe "substantial deference to the predictive judgments" of the Virginia General Assembly, for whom the Proponents purport to speak. Turner Broad. Sys., Inc. v. FCC, 520 U.S. 180, 195 (1997). However, even if we view the Proponents' theories through rose-colored glasses, we conclude that they are unfounded for two key reasons. First, the Supreme Court rejected the view that marriage is about only procreation in Griswold v. Connecticut, in which it upheld married couples' right not to procreate and articulated a view of marriage that has nothing to do with children:

> Marriage is a coming together for better or for worse, hopefully enduring, and intimate to the degree of being sacred. It is an association that promotes a way of life, not causes; a harmony in living, not political faiths; a bilateral loyalty, not commercial or social projects. Yet it is an association for as noble a purpose as any involved in our prior decisions.

381 U.S. at 485-86; see also Turner, 482 U.S. at 95-96 (describing many non-procreative purposes of marriage). The fact that marriage's stabilizing norms have endured in the five decades since the Supreme Court made this pronouncement weakens

52

the argument that couples remain in monogamous marriages only for the sake of their offspring.

Second, the primary support that the Proponents offer for their theory is the legacy of a wholly unrelated legal change to marriage: no-fault divorce. Although no-fault divorce certainly altered the realities of married life by making it easier for couples to end their relationships, we have no reason to think that legalizing same-sex marriage will have a similar destabilizing effect. In fact, it is more logical to think that same-sex couples want access to marriage so that they can take advantage of its hallmarks, including faithfulness and permanence, and that allowing loving, committed same-sex couples to marry and recognizing their out-of-state marriages will strengthen the institution of marriage. We therefore reject the Proponents' concerns.

## 4. Responsible Procreation

Next, the Proponents contend that the Virginia Marriage Laws' differentiation between opposite-sex and same-sex couples stems from the fact that unintended pregnancies cannot result from same-sex unions. By sanctioning only opposite-sex marriages, the Virginia Marriage Laws "provid[e] stability to the types of relationships that result in unplanned pregnancies, thereby avoiding or diminishing the negative outcomes often

associated with unintended children." The Proponents allege that children born to unwed parents face a "significant risk" of being raised in unstable families, which is harmful to their development. Virginia, "of course, has a duty of the highest order to protect the interests of minor children, particularly those of tender years." Palmore v. Sidoti, 466 U.S. 429, 433 (1984). However, the Virginia Marriage Laws are not appropriately tailored to further this interest.

If Virginia sought to ensure responsible procreation via the Virginia Marriage Laws, the laws are woefully underinclusive. Same-sex couples are not the only category of couples who cannot reproduce accidentally. For example, opposite-sex couples cannot procreate unintentionally if they include a post-menopausal woman or an individual with a medical condition that prevents unassisted conception.

The Proponents attempt to downplay the similarity between same-sex couples and infertile opposite-sex couples in three ways. First, they point out that sterile individuals could remedy their fertility through future medical advances. This potentiality, however, does not explain why Virginia should treat same-sex and infertile opposite-sex couples differently during the course of the latter group's infertility. Second, the Proponents posit that, even if one member of a man-woman couple is sterile, the other member may not be. They suggest

54

that, without marriage's monogamy mandate, this fertile individual is more likely to have an unintended child with a third party. They contend that, due to this possibility, even opposite-sex couples who cannot procreate need marriage to channel their procreative activity in a way that same-sex couples do not. The Proponents' argument assumes that individuals in same-sex relationships never have opposite-sex sexual partners, which is simply not the case. Third, the Proponents imply that, by marrying, infertile opposite-sex couples set a positive example for couples who can have unintended children, thereby encouraging them to marry. We see no reason why committed same-sex couples cannot serve as similar role models. We therefore reject the Proponents' attempts to differentiate same-sex couples from other couples who cannot procreate accidentally. Because same-sex couples and infertile opposite-sex couples are similarly situated, the Equal Protection Clause counsels against treating these groups differently. See City of Cleburne, 473 U.S. at 439 (explaining that the Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike").

Due to the Virginia Marriage Laws' underinclusivity, this case resembles City of Cleburne v. Cleburne Living Center, Inc. In City of Cleburne, the Supreme Court struck down a city law that required group homes for the intellectually disabled to

55

obtain a special use permit. Id. at 447-50. The city did not impose the same requirement on similar structures, such as apartment complexes and nursing homes. Id. at 447. The Court determined that the permit requirement was so underinclusive that the city's motivation must have "rest[ed] on an irrational prejudice," rendering the law unconstitutional. Id. at 450. In light of the Virginia Marriage Laws' extreme underinclusivity, we are forced to draw the same conclusion in this case.

The Proponents' responsible procreation argument falters for another reason as well. Strict scrutiny requires that a state's means further its compelling interest. See Shaw, 517 U.S. at 915 ("Although we have not always provided precise guidance on how closely the means . . . must serve the end (the justification or compelling interest), we have always expected that the legislative action would substantially address, if not achieve, the avowed purpose."). Prohibiting same-sex couples from marrying and ignoring their out-of-state marriages does not serve Virginia's goal of preventing out-of-wedlock births. Although same-sex couples cannot procreate accidentally, they can and do have children via other methods. According to an amicus brief filed by Dr. Gary J. Gates, as of the 2010 U.S. Census, more than 2500 same-sex couples were raising more than 4000 children under the age of eighteen in Virginia. The

Virginia Marriage Laws therefore increase the number of children raised by unmarried parents.

The Proponents acknowledge that same-sex couples become parents. They contend, however, that the state has no interest in channeling same-sex couples' procreative activities into marriage because same-sex couples "bring children into their relationship[s] only through intentional choice and pre-planned action." Accordingly, "[t]hose couples neither advance nor threaten society's public purpose for marriage"—stabilizing parental relationships for the benefit of children—"in the same manner, or to the same degree, that sexual relationships between men and women do."

In support of this argument, the Proponents invoke the Supreme Court's decision in Johnson v. Robison, 415 U.S. 361 (1974). Johnson concerned educational benefits that the federal government granted to military veterans who served on active duty. Id. at 363. The government provided these benefits to encourage enlistment and make military service more palatable to existing servicemembers. Id. at 382-83. A conscientious objector—who refused to serve in the military for religious reasons—brought suit, contending that the government acted unconstitutionally by granting benefits to veterans but not conscientious objectors. Id. at 363-64. The Court explained that, "[w]hen, as in this case, the inclusion of one group

promotes a legitimate governmental purpose, and the addition of other groups would not, we cannot say that the statute's classification of beneficiaries and nonbeneficiaries is invidiously discriminatory." Id. at 383. Because offering educational benefits to conscientious objectors would not incentivize military service, the federal government's line-drawing was constitutional. Johnson, 415 U.S. at 382-83. The Proponents claim that treating opposite-sex couples differently from same-sex couples is equally justified because the two groups are not similarly situated with respect to their procreative potential.

Johnson applied rational basis review, id. at 374-75, so we strongly doubt its applicability to our strict scrutiny analysis. In any event, we can easily distinguish Johnson from the instant case. In Johnson, offering educational benefits to veterans who served on active duty promoted the government's goal of making military service more attractive. Extending those benefits to conscientious objectors, whose religious beliefs precluded military service, did not further that objective. By contrast, a stable marital relationship is attractive regardless of a couple's procreative ability. Allowing infertile opposite-sex couples to marry does nothing to further the government's goal of channeling procreative conduct into marriage. Thus, excluding same-sex couples from marriage

58

due to their inability to have unintended children makes little sense.  <u>Johnson</u> therefore does not alter our conclusion that barring same-sex couples' access to marriage does nothing to further Virginia's interest in responsible procreation.

### 5.  Optimal Childrearing

We now shift to discussing the merit of the final compelling interest that the Proponents invoke:  optimal childrearing.  The Proponents aver that "children develop best when reared by their married biological parents in a stable family unit."  They dwell on the importance of "gender-differentiated parenting" and argue that sanctioning same-sex marriage will deprive children of the benefit of being raised by a mother and a father, who have "distinct parenting styles."  In essence, the Proponents argue that the Virginia Marriage Laws safeguard children by preventing same-sex couples from marrying and starting inferior families.

The Opponents and their amici cast serious doubt on the accuracy of the Proponents' contentions.  For example, as the American Psychological Association, American Academy of Pediatrics, American Psychiatric Association, National Association of Social Workers, and Virginia Psychological Association (collectively, the APA) explain in their amicus brief, "there is no scientific evidence that parenting

effectiveness is related to parental sexual orientation," and "the same factors"—including family stability, economic resources, and the quality of parent-child relationships—"are linked to children's positive development, whether they are raised by heterosexual, lesbian, or gay parents." According to the APA, "the parenting abilities of gay men and lesbians—and the positive outcomes for their children—are <u>not</u> areas where most credible scientific researchers disagree," and the contrary studies that the Proponents cite "do not reflect the current state of scientific knowledge." <u>See also</u> <u>DeBoer</u>, 973 F. Supp. 2d at 760-68 (making factual findings and reaching the same conclusion). In fact, the APA explains that, by preventing same-sex couples from marrying, the Virginia Marriage Laws actually harm the children of same-sex couples by stigmatizing their families and robbing them of the stability, economic security, and togetherness that marriage fosters. The Supreme Court reached a similar conclusion in <u>Windsor</u>, in which it observed that failing to recognize same-sex marriages "humiliates tens of thousands of children now being raised by same-sex couples" and "makes it even more difficult for the children to understand the integrity and closeness of their own family and its concord with other families in their community and in their daily lives." 133 S. Ct. at 2694.

We find the arguments that the Opponents and their amici make on this issue extremely persuasive. However, we need not resolve this dispute because the Proponents' optimal childrearing argument falters for at least two other reasons. First, under heightened scrutiny, states cannot support a law using "overbroad generalizations about the different talents, capacities, or preferences of" the groups in question. United States v. Virginia, 518 U.S. 515, 533-34 (1996) (rejecting "inherent differences" between men and women as a justification for excluding all women from a traditionally all-male military college); see also Stanley v. Illinois, 405 U.S. 645, 656-58 (1972) (holding that a state could not presume that unmarried fathers were unfit parents). The Proponents' statements regarding same-sex couples' parenting ability certainly qualify as overbroad generalizations. Second, as we explain above, strict scrutiny requires congruity between a law's means and its end. This congruity is absent here. There is absolutely no reason to suspect that prohibiting same-sex couples from marrying and refusing to recognize their out-of-state marriages will cause same-sex couples to raise fewer children or impel married opposite-sex couples to raise more children. The Virginia Marriage Laws therefore do not further Virginia's interest in channeling children into optimal families, even if

we were to accept the dubious proposition that same-sex couples are less capable parents.

Because the Proponents' arguments are based on overbroad generalizations about same-sex parents, and because there is no link between banning same-sex marriage and promoting optimal childrearing, this aim cannot support the Virginia Marriage Laws. All of the Proponents' justifications for the Virginia Marriage Laws therefore fail, and the laws cannot survive strict scrutiny.

V.

For the foregoing reasons, we conclude that the Virginia Marriage Laws violate the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the extent that they prevent same-sex couples from marrying and prohibit Virginia from recognizing same-sex couples' lawful out-of-state marriages. We therefore affirm the district court's grant of the Plaintiffs' motion for summary judgment and its decision to enjoin enforcement of the Virginia Marriage Laws.[10]

---

[10] Because we are able to resolve the merits of the Opponents' claims, we need not consider their alternative request for a preliminary injunction. We assume that the district court's decision to enjoin enforcement of the Virginia Marriage Laws encompassed a permanent injunction, which the Plaintiffs requested in connection with their motion for summary judgment.

We recognize that same-sex marriage makes some people deeply uncomfortable. However, inertia and apprehension are not legitimate bases for denying same-sex couples due process and equal protection of the laws. Civil marriage is one of the cornerstones of our way of life. It allows individuals to celebrate and publicly declare their intentions to form lifelong partnerships, which provide unparalleled intimacy, companionship, emotional support, and security. The choice of whether and whom to marry is an intensely personal decision that alters the course of an individual's life. Denying same-sex couples this choice prohibits them from participating fully in our society, which is precisely the type of segregation that the Fourteenth Amendment cannot countenance.

<u>AFFIRMED</u>

NIEMEYER, Circuit Judge, dissenting:

To be clear, this case is not about whether courts favor or disfavor same-sex marriage, or whether States recognizing or declining to recognize same-sex marriage have made good policy decisions. It is much narrower. It is about whether a State's decision not to recognize same-sex marriage violates the Fourteenth Amendment of the U.S. Constitution. Thus, the judicial response must be limited to an analysis applying established constitutional principles.

The Commonwealth of Virginia has always recognized that "marriage" is based on the "mutual agreement of a man and a woman to marry each other," Burke v. Shaver, 23 S.E. 749, 749 (Va. 1895), and that a marriage's purposes include "establishing a family, the continuance of the race, the propagation of children, and the general good of society," Alexander v. Kuykendall, 63 S.E.2d 746, 748 (Va. 1951). In recent years, it codified that understanding in several statutes, which also explicitly exclude from the definition of "marriage" the union of two men or two women. Moreover, in 2006 the people of Virginia amended the Commonwealth's Constitution to define marriage as only between "one man and one woman." Va. Const. art. I, § 15-A.

The plaintiffs, who are in long-term same-sex relationships, are challenging the constitutionality of

Virginia's marriage laws under the Due Process and Equal Protection Clauses of the U.S. Constitution. The district court sustained their challenge, concluding that the plaintiffs have a fundamental right to marry each other under the Due Process Clause of the Fourteenth Amendment and therefore that any regulation of that right is subject to strict scrutiny. Concluding that Virginia's definition of marriage failed even "to display a rational relationship to a legitimate purpose and so must be viewed as constitutionally infirm," the court struck down Virginia's marriage laws as unconstitutional and enjoined their enforcement. Bostic v. Rainey, 970 F. Supp. 2d 456, 482 (E.D. Va. 2014).

The majority agrees. It concludes that the fundamental right to marriage includes a right to same-sex marriage and that therefore Virginia's marriage laws must be reviewed under strict scrutiny. It holds that Virginia has failed to advance a compelling state interest justifying its definition of marriage as between only a man and a woman. In reaching this conclusion, however, the majority has failed to conduct the necessary constitutional analysis. Rather, it has simply declared syllogistically that because "marriage" is a fundamental right protected by the Due Process Clause and "same-sex marriage" is a form of marriage, Virginia's laws declining to recognize same-

65

sex marriage infringe the fundamental right to marriage and are therefore unconstitutional.

Stated more particularly, the majority's approach begins with the parties' agreement that "marriage" is a fundamental right. Ante at 40. From there, the majority moves to the proposition that "the right to marry is an expansive liberty interest," ante at 41, "that is not circumscribed based on the characteristics of the individuals seeking to exercise that right," ante at 42-43. For support, it notes that the Supreme Court has struck down state restrictions prohibiting interracial marriage, see Loving v. Virginia, 388 U.S. 1 (1967); prohibiting prison inmates from marrying without special approval, see Turner v. Safley, 482 U.S. 78 (1987); and prohibiting persons owing child support from marrying, see Zablocki v. Redhail, 434 U.S. 374 (1978). It then declares, ipse dixit, that "the fundamental right to marry encompasses the right to same-sex marriage" and is thus protected by the substantive component of the Due Process Clause. Ante at 41. In reaching this conclusion, the majority "decline[s] the Proponents' invitation to characterize the right at issue in this case as the right to same-sex marriage rather than simply the right to marry." Ante at 44. And in doing so, it explicitly bypasses the relevant constitutional analysis required by Washington v. Glucksberg, 521 U.S. 702 (1997), stating that a Glucksberg analysis is not

necessary because no <u>new</u> fundamental right is being recognized. <u>Ante</u> at 41-42.

This analysis is fundamentally flawed because it fails to take into account that the "marriage" that has long been recognized by the Supreme Court as a fundamental right is distinct from the newly proposed relationship of a "same-sex marriage." And this failure is even more pronounced by the majority's acknowledgment that same-sex marriage is a new notion that has not been recognized "for most of our country's history." <u>Ante</u> at 41. Moreover, the majority fails to explain how this new notion became incorporated into the traditional definition of marriage except by linguistic manipulation. Thus, the majority never asks the question necessary to finding a fundamental right -- whether same-sex marriage is a right that is "deeply rooted in this Nation's history and tradition" and "implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if [it was] sacrificed." <u>Glucksberg</u>, 521 U.S. at 721 (quoting <u>Moore v. East Cleveland</u>, 431 U.S. 494, 503 (1977) (plurality opinion); <u>Palko v. Connecticut</u>, 302 U.S. 319, 325-26 (1937)) (internal quotation marks omitted).

At bottom, in holding that same-sex marriage is encompassed by the traditional right to marry, the majority avoids the necessary constitutional analysis, concluding simply and broadly

that the fundamental "right to marry" -- by everyone and to anyone -- may not be infringed. And it does not anticipate or address the problems that this approach causes, failing to explain, for example, why this broad right to marry, as the majority defines it, does not also encompass the "right" of a father to marry his daughter or the "right" of any person to marry multiple partners.

If the majority were to recognize and address the distinction between the two relationships -- the traditional one and the new one -- as it must, it would simply be unable to reach the conclusion that it has reached.

I respectfully submit that, for the reasons that follow, Virginia was well within its constitutional authority to adhere to its traditional definition of marriage as the union of a man and a woman and to exclude from that definition the union of two men or two women. I would also agree that the U.S. Constitution does not prohibit a State from defining marriage to include same-sex marriage, as many States have done. Accordingly, I would reverse the judgment of the district court and uphold Virginia's marriage laws.

I

As the majority has observed, state recognition of same-sex marriage is a new phenomenon. Its history began in the early

68

2000s with the recognition in some States of civil unions. See, e.g., Vt. Stat. Ann. tit. 15, §§ 1201-1202 (2000); D.C. Code § 32-701 (1992) (effective in 2002); Cal. Fam. Code §§ 297-298 (2003); N.J. Stat. Ann. § 26:8A-2 (2003); Conn. Gen. Stat. Ann. § 46b-38nn (2006), invalidated by Kerrigan v. Comm'r of Pub. Health, 957 A.2d 407 (Conn. 2008). And the notion of same-sex marriage itself first gained traction in 2003, when the Massachusetts Supreme Judicial Court held that the Commonwealth's prohibition on issuing marriage licenses to same-sex couples violated the State's Constitution -- the first decision holding that same-sex couples had a right to marry. See Goodridge v. Dep't of Pub. Health, 798 N.E.2d 941, 968 (Mass. 2003). In 2009, Vermont became the first State to enact legislation recognizing same-sex marriage, and, since then, 11 other States and the District of Columbia have also done so. See Conn. Gen. Stat. §§ 46b-20 to 46b-20a; Del. Code Ann. tit. 13, § 101; D.C. Code § 46-401; Haw. Rev. Stat. § 572-1; 750 Ill. Comp. Stat. 5/201; Me. Rev. Stat. tit. 19-A, § 650-A; Md. Code Ann., Fam. Law §§ 2-201 to 2-202; Minn. Stat. Ann. §§ 517.01 to 517.03; N.H. Rev. Stat. Ann. §§ 457:1-a to 457:2; N.Y. Dom. Rel. Law § 10-a; R.I. Gen. Laws § 15-1-1 et seq.; Vt. Stat. Ann. tit. 15, § 8; Wash. Rev. Code §§ 26.04.010 to 26.04.020. Moreover, seven other States currently allow same-sex marriage as a result of court rulings. See Hollingsworth v. Perry, 133 S. Ct. 2652

69

(2013); <u>Varnum v. Brien</u>, 763 N.W.2d 862 (Iowa 2009); <u>Goodridge</u>, 798 N.E.2d 941; <u>Garden State Equality v. Dow</u>, 79 A.3d 1036 (N.J. 2013); <u>Griego v. Oliver</u>, 316 P.3d 865 (N.M. 2013); <u>Geiger v. Kitzhaber</u>, ___ F. Supp. 2d ___, No. 6:13-CV-01834-MC, 2014 WL 2054264 (D. Or. May 19, 2014); <u>Whitewood v. Wolf</u>, ___ F. Supp. 2d ___, No. 1:13-CV-1861, 2014 WL 2058105 (M.D. Pa. May 20, 2014). This is indeed a recent phenomenon.

Virginia only recognizes marriage as between one man and one woman, and, like a majority of States, it has codified this view. <u>See</u> Va. Code Ann. § 20-45.2 (prohibiting same-sex marriage and declining to recognize same-sex marriages conducted in other States); <u>id.</u> § 20-45.3 (prohibiting civil unions and similar arrangements between persons of the same sex). The bill originally proposing what would become § 20-45.3 noted the basis for Virginia's legislative decision:

> [H]uman marriage is a consummated two in one communion of male and female persons made possible by sexual differences which are reproductive in type, whether or not they are reproductive in effect or motivation. This present relationship recognizes the equality of male and female persons, and antedates recorded history.

Affirmation of Marriage Act, H.D. 751, 2004 Gen. Assembly, Reg. Sess. (Va. 2004). The bill predicted that the recognition of same-sex marriage would "radically transform the institution of marriage with serious and harmful consequences to the social order." <u>Id.</u> Virginia also amended its Constitution in 2006 to

70

define marriage as only between "one man and one woman" and to prohibit "a legal status for relationships of unmarried individuals that intends to approximate the design, qualities, significance, or effects of marriage." Va. Const. art. I, § 15-A. The plaintiffs commenced this action to challenge the constitutionality of Virginia's marriage laws.

Plaintiffs Timothy B. Bostic and Tony C. London have lived in a committed same-sex relationship since 1989 and have lived in Virginia since 1991. The two desired to marry in Virginia, and on July 1, 2013, when they applied for a marriage license at the office of the Clerk of the Circuit Court for the City of Norfolk, they were denied a license and told that same-sex couples are ineligible to marry in Virginia. In their complaint challenging Virginia's marriage laws, they alleged that their inability to marry has disadvantaged them in both economic and personal ways -- it has prevented them from filing joint tax returns, kept them from sharing health insurance on a tax-free basis, and signaled that they are "less than" other couples in Virginia.

Plaintiffs Carol Schall and Mary Townley likewise have lived in a committed same-sex relationship since 1985 and have lived in Virginia throughout their 29-year relationship. In 1998, Townley gave birth to a daughter, E.S.-T., whom Schall and Townley have raised together, and in 2008, the two traveled to

71

California where they were lawfully married. They alleged in their complaint that because Virginia does not recognize their marriage as valid, they have been injured in several ways. Schall is unable to legally adopt E.S.-T., and the two are unable to share health insurance on a tax-free basis. The two also claimed that they and E.S.-T. have experienced stigma as a result of Virginia's nonrecognition of their marriage.

The plaintiffs' complaint, filed in July 2013, alleged that Virginia's marriage laws violate their constitutional rights under the Due Process and Equal Protection Clauses of the Fourteenth Amendment. They named as defendants George E. Schaefer, III, Clerk of Court for the Norfolk Circuit Court, and Janet M. Rainey, the State Registrar of Vital Records. A third Virginia official, Michèle B. McQuigg, Clerk of Court for the Prince William County Circuit Court, was permitted to intervene as a defendant. As elected circuit court clerks, Schaefer and McQuigg are responsible for issuing individual marriage licenses in the localities in which they serve. And Rainey, as the State Registrar of Vital Records, is responsible for ensuring compliance with Virginia's marriage laws, including the laws challenged in this case.

After the parties filed cross-motions for summary judgment, Virginia underwent a change in administrations, and the newly elected Attorney General of Virginia, Mark Herring, filed a

72

notice of a change in his office's legal position on behalf of his client, defendant Janet Rainey. His notice stated that because, in his view, the laws at issue were unconstitutional, his office would no longer defend them on behalf of Rainey. He noted, however, that Rainey would continue to enforce the laws until the court's ruling. The other officials have continued to defend Virginia's marriage laws, and, for convenience, I refer to the defendants herein as "Virginia."

Following a hearing, the district court, by an order and memorandum dated February 14, 2014, granted the plaintiffs' motion for summary judgment and denied Virginia's cross-motion. The court concluded that same-sex partners have a fundamental right to marry each other under the Due Process Clause of the Fourteenth Amendment, thus requiring that Virginia's marriage laws restricting that right be narrowly drawn to further a compelling state interest. It concluded that the laws did not meet that requirement and, indeed, "fail[ed] to display a rational relationship to a legitimate purpose, and so must be viewed as constitutionally infirm under even the least onerous level of scrutiny." Bostic, 970 F. Supp. 2d at 482. Striking down Virginia's marriage laws, the court also issued an order enjoining their enforcement but stayed that order pending appeal. This appeal followed.

The plaintiffs contend that, as same-sex partners, they have a fundamental right to marry that is protected by the substantive component of the Due Process Clause of the U.S. Constitution, U.S. Const. amend. XIV, § 1 (prohibiting any State from depriving "any person of life, liberty, or property, without due process of law"), and that Virginia's laws defining marriage as only between a man and a woman and excluding same-sex marriage infringe on that right. The constitutional analysis for adjudging their claim is well established.

The Constitution contains no language directly protecting the right to same-sex marriage or even traditional marriage. Any right to same-sex marriage, therefore, would have to be found, through court interpretation, as a substantive component of the Due Process Clause. See Planned Parenthood of Southeastern Pa. v. Casey, 505 U.S. 833, 846 (1992) ("Although a literal reading of the Clause might suggest that it governs only the procedures by which a State may deprive persons of liberty, for at least 105 years . . . the Clause has been understood to contain a substantive component as well").

The substantive component of the Due Process Clause only protects "fundamental" liberty interests. And the Supreme Court has held that liberty interests are only fundamental if they are, "objectively, 'deeply rooted in this Nation's history and

74

tradition,' and 'implicit in the concept of ordered liberty,' such that 'neither liberty nor justice would exist if they were sacrificed.'" Glucksberg, 521 U.S. at 720-21 (citation omitted) (quoting Moore, 431 U.S. at 503 (plurality opinion); Palko, 302 U.S. at 325-26). When determining whether such a fundamental right exists, a court must always make "a 'careful description' of the asserted fundamental liberty interest." Id. at 721 (emphasis added) (quoting Reno v. Flores, 507 U.S. 292, 302 (1993)). This "careful description" involves characterizing the right asserted in its narrowest terms. Thus, in Glucksberg, where the Court was presented with a due process challenge to a state statute banning assisted suicide, the Court narrowly characterized the right being asserted in the following manner:

> The Court of Appeals stated that "[p]roperly analyzed, the first issue to be resolved is whether there is a liberty interest in determining the time and manner of one's death," or, in other words, "[i]s there a right to die?" Similarly, respondents assert a "liberty to choose how to die" and a right to "control of one's final days," and describe the asserted liberty as "the right to choose a humane, dignified death," and "the liberty to shape death." As noted above, we have a tradition of carefully formulating the interest at stake in substantive-due-process cases. . . . The Washington statute at issue in this case prohibits "aid[ing] another person to attempt suicide," and, thus, the question before us is whether the "liberty" specially protected by the Due Process Clause includes a right to commit suicide which itself includes a right to assistance in doing so.

Glucksberg, 521 U.S. at 722-23 (alterations in original) (emphasis added) (citations omitted).

75

Under this formulation, because the Virginia laws at issue prohibit "marriage between persons of the same sex," Va. Code Ann. § 20-45.2, "the question before us is whether the 'liberty' specially protected by the Due Process Clause includes a right" to same-sex marriage.  Glucksberg, 521 U.S. at 723; see also Jackson v. Abercrombie, 884 F. Supp. 2d 1065, 1095 (D. Haw. 2012) ("[M]issing from Plaintiffs' asserted 'right to marry the person of one's choice' is its centerpiece:  the right to marry someone of the same gender").

When a fundamental right is so identified, then any statute restricting the right is subject to strict scrutiny and must be "narrowly tailored to serve a compelling state interest." Flores, 507 U.S. at 302.  Such scrutiny is extremely difficult for a law to withstand, and, as such, the Supreme Court has noted that courts must be extremely cautious in recognizing fundamental rights because doing so ordinarily removes freedom of choice from the hands of the people:

> [W]e "ha[ve] always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended."  By extending constitutional protection to an asserted right or liberty interest, we, to a great extent, place the matter outside the arena of public debate and legislative action.  We must therefore "exercise the utmost care whenever we are asked to break new ground in this field," lest the liberty protected by the Due Process Clause be subtly transformed into the policy preferences of the Members of this Court.

Glucksberg, 521 U.S. at 720 (second alteration in original) (emphasis added) (quoting Collins v. City of Harker Heights, 503 U.S. 115, 125 (1992)).

The plaintiffs in this case, as well as the majority, recognize that narrowly defining the asserted liberty interest would require them to demonstrate a new fundamental right to same-sex marriage, which they cannot do. Thus, they have made no attempt to argue that same-sex marriage is, "objectively, deeply rooted in this Nation's history and tradition," and "implicit in the concept of ordered liberty." Glucksberg, 521 U.S. at 720-21 (internal quotation marks omitted). Indeed, they have acknowledged that recognition of same-sex marriage is a recent development. See ante at 41; see also United States v. Windsor, 133 S. Ct. 2675, 2689 (2013) ("Until recent years, many citizens had not even considered the possibility of [same-sex marriage]" (emphasis added)); id. at 2715 (Alito, J., dissenting) (noting that it is "beyond dispute that the right to same-sex marriage is not deeply rooted in this Nation's history and tradition"); Baehr v. Lewin, 852 P.2d 44, 57 (Haw. 1993) ("[W]e do not believe that a right to same-sex marriage is so rooted in the traditions and collective conscience of our people that failure to recognize it would violate the fundamental principles of liberty and justice that lie at the base of all our civil and political institutions").

Instead, the plaintiffs and the majority argue that the fundamental right to marriage that has previously been recognized by the Supreme Court is a broad right that should apply to the plaintiffs without the need to recognize a new fundamental right to same-sex marriage. They argue that this approach is supported by the fact that the Supreme Court did not narrowly define the right to marriage in its decisions in Loving, 388 U.S. at 12; Turner, 482 U.S. at 94-96; or Zablocki, 434 U.S. at 383-86.

It is true that, in those cases, the Court did not recognize new, separate fundamental rights to fit the factual circumstances in each case. For example, in Loving, the Court did not examine whether interracial marriage was, objectively, deeply rooted in our Nation's history and tradition. But it was not required to do so. Each of those cases involved a couple asserting a right to enter into a traditional marriage of the type that has always been recognized since the beginning of the Nation -- a union between one man and one woman. While the context for asserting the right varied in each of those cases, it varied only in ways irrelevant to the concept of marriage. The type of relationship sought was always the traditional, man-woman relationship to which the term "marriage" was theretofore always assumed to refer. Thus, none of the cases cited by the plaintiffs and relied on by the majority involved the assertion

78

of a brand new liberty interest.  To the contrary, they involved the assertion of one of the oldest and most fundamental liberty interests in our society.

To now define the previously recognized fundamental right to "marriage" as a concept that includes the new notion of "same-sex marriage" amounts to a dictionary jurisprudence, which defines terms as convenient to attain an end.

It is true that same-sex and opposite-sex relationships share many attributes, and, therefore, marriages involving those relationships would, to a substantial extent, be similar.  Two persons who are attracted to each other physically and emotionally and who love each other could publicly promise to live with each other thereafter in a mutually desirable relationship.  These aspects are the same whether the persons are of the same sex or different sexes.  Moreover, both relationships could successfully function to raise children, although children in a same-sex relationship would come from one partner or from adoption.  But there are also significant distinctions between the relationships that can justify differential treatment by lawmakers.

Only the union of a man and a woman has the capacity to produce children and thus to carry on the species.  And more importantly, only such a union creates a biological family unit that also gives rise to a traditionally stable political unit.

79

Every person's identity includes the person's particular biological relationships, which create unique and meaningful bonds of kinship that are extraordinarily strong and enduring and that have been afforded a privileged place in political order throughout human history. Societies have accordingly enacted laws promoting the family unit -- such as those relating to sexual engagement, marriage rites, divorce, inheritance, name and title, and economic matters. And many societies have found familial bonds so critical that they have elevated marriage to be a sacred institution trapped with religious rituals. In these respects, the traditional man-woman relationship is unique.

Thus, when the Supreme Court has recognized, through the years, that the right to marry is a fundamental right, it has emphasized the procreative and social ordering aspects of traditional marriage. For example, it has said: "[Marriage] is an institution, in the maintenance of which in its purity the public is deeply interested, <u>for it is the foundation of the family and of society</u>, without which there would be neither civilization nor progress," <u>Maynard v. Hill</u>, 125 U.S. 190, 211 (1888) (emphasis added); Marriage is "one of the basic civil rights of man. Marriage and procreation are fundamental to the very existence and survival of the race," <u>Skinner v. Oklahoma ex rel. Williamson</u>, 316 U.S. 535, 541 (1942); "It is not surprising

that the decision to marry has been placed on the same level of importance as decisions relating to procreation, childbirth, childrearing, and family relationships. . . . [Marriage] is the foundation of the family in our society," Zablocki, 434 U.S. at 386.

Because there exist deep, fundamental differences between traditional and same-sex marriage, the plaintiffs and the majority err by conflating the two relationships under the loosely drawn rubric of "the right to marriage." Rather, to obtain constitutional protection, they would have to show that the right to same-sex marriage is itself deeply rooted in our Nation's history. They have not attempted to do so and could not succeed if they were so to attempt.

In an effort to bridge the obvious differences between the traditional relationship and the new same-sex relationship, the plaintiffs argue that the fundamental right to marriage "has always been based on, and defined by, the constitutional liberty to select the partner of one's choice." (Emphasis added). They rely heavily on Loving to assert this claim. In Loving, the Court held that a state regulation restricting interracial marriage infringed on the fundamental right to marriage. Loving, 388 U.S. at 12. But nowhere in Loving did the Court suggest that the fundamental right to marry includes the unrestricted right to marry whomever one chooses, as the

plaintiffs claim.  Indeed, <u>Loving</u> explicitly relied on <u>Skinner</u> and <u>Murphy</u>, and both of those cases discussed marriage in traditional, procreative terms.  <u>Id.</u>

This reading of <u>Loving</u> is fortified by the Court's summary dismissal of <u>Baker v. Nelson</u>, 191 N.W.2d 185 (Minn. 1971), <u>appeal dismissed</u>, 409 U.S. 810 (1972), just five years after <u>Loving</u> was decided.  In <u>Baker</u>, the Minnesota Supreme Court interpreted a state statute's use of the term "marriage" to be one of common usage meaning a union "between persons of the opposite sex" and thus not including same-sex marriage.  <u>Id.</u> at 186.  On appeal, the Supreme Court dismissed the case summarily "for want of a substantial federal question."  409 U.S. at 810. The Court's action in context indicates that the Court did not view <u>Loving</u> or the cases that preceded it as providing a fundamental right to an unrestricted choice of marriage partner. Otherwise, the state court's decision in <u>Baker</u> would indeed have presented a substantial federal question.

In short, <u>Loving</u> simply held that race, which is completely unrelated to the institution of marriage, could not be the basis of marital restrictions.  <u>See</u> <u>Loving</u>, 388 U.S. at 12.  To stretch <u>Loving</u>'s holding to say that the right to marry is not limited by gender and sexual orientation is to ignore the inextricable, biological link between marriage and procreation that the Supreme Court has always recognized.  <u>See</u> <u>Windsor</u>, 133

82

S. Ct. at 2689 (recognizing that throughout history, "marriage between a man and a woman no doubt had been thought of by most people as essential to the very definition of that term and to its role and function"). The state regulation struck down in Loving, like those in Zablocki and Turner, had no relationship to the foundational purposes of marriage, while the gender of the individuals in a marriage clearly does. Thus, the majority errs, as did the district court, by interpreting the Supreme Court's marriage cases as establishing a right that includes same-sex marriage.

The plaintiffs also largely ignore the problem with their position that if the fundamental right to marriage is based on "the constitutional liberty to select the partner of one's choice," as they contend, then that liberty would also extend to individuals seeking state recognition of other types of relationships that States currently restrict, such as polygamous or incestuous relationships. Cf. Romer v. Evans, 517 U.S. 620, 648-50 (1996) (Scalia, J., dissenting). Such an extension would be a radical shift in our understanding of marital relationships. Laws restricting polygamy are foundational to the Union itself, having been a condition on the entrance of Arizona, New Mexico, Oklahoma, and Utah into statehood. Id. While the plaintiffs do attempt to assure us that such laws are safe because "there are weighty government interests underlying"

83

them, such an argument does not bear on the question of whether the right is fundamental. The government's interests would instead be relevant only to whether the restriction could meet the requisite standard of review. And because laws prohibiting polygamous or incestuous marriages restrict individuals' right to choose whom they would like to marry, they would, under the plaintiffs' approach, have to be examined under strict scrutiny. Perhaps the government's interest would be strong enough to enable such laws to survive strict scrutiny, but regardless, today's decision would truly be a sweeping one if it could be understood to mean that individuals have a <u>fundamental right to enter into a marriage with any person, or any people, of their choosing</u>.

At bottom, the fundamental right to marriage does not include a right to same-sex marriage. Under the <u>Glucksberg</u> analysis that we are thus bound to conduct, there is no new fundamental right to same-sex marriage. Virginia's laws restricting marriage to man-woman relationships must therefore be upheld if there is <u>any rational basis</u> for the laws.

## III

Under rational-basis review, courts are required to give heavy deference to legislatures. The standard

> simply requires courts to determine whether the classification in question is, at a minimum,

84

> rationally related to legitimate governmental goals. In other words, the fit between the enactment and the public purposes behind it need not be mathematically precise. As long as [the legislature] has a reasonable basis for adopting the classification, which can include "rational speculation unsupported by evidence or empirical data," the statute will pass constitutional muster. The rational basis standard thus embodies an idea critical to the continuing vitality of our democracy: that courts are not empowered to "sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations."

Wilkins v. Gaddy, 734 F.3d 344, 347-48 (4th Cir. 2013) (emphasis added) (citations omitted) (quoting FCC v. Beach Commc'ns, Inc., 508 U.S. 307, 315 (1993); City of New Orleans v. Dukes, 427 U.S. 297, 303 (1976)). Statutes subject to rational-basis review "bear[] a strong presumption of validity, and those attacking the rationality of the legislative classification have the burden 'to negative every conceivable basis which might support [them].'" Beach Commc'ns, 508 U.S. at 314-15 (emphasis added) (citation omitted) (quoting Lehnhausen v. Lake Shore Auto Parts Co., 410 U.S. 356, 364 (1973)).

In contending that there is a rational basis for its marriage laws, Virginia has emphasized that children are born only to one man and one woman and that marriage provides a family structure by which to nourish and raise those children. It claims that a biological family is a more stable environment, and it renounces any interest in encouraging same-sex marriage. It argues that the purpose of its marriage laws "is to channel

85

the presumptive procreative potential of man-woman relationships into enduring marital unions so that if any children are born, they are more likely to be raised in stable family units." (Emphasis omitted). Virginia highlights especially marriage's tendency to promote stability in the event of unplanned pregnancies, asserting that it has "a compelling interest in addressing the particular concerns associated with the birth of unplanned children. . . . [C]hildren born from unplanned pregnancies where their mother and father are not married to each other are at significant risk of being raised outside stable family units headed by their mother and father jointly."

Virginia states that its justifications for promoting traditional marriage also explain its lack of interest in promoting same-sex marriage. It maintains that a traditional marriage is "exclusively [an] opposite-sex institution . . . inextricably linked to procreation and biological kinship," Windsor, 133 S. Ct. at 2718 (Alito, J., dissenting), and that same-sex marriage prioritizes the emotions and sexual attractions of the two partners without any necessary link to reproduction. It asserts that it has no interest in "licensing adults' love."

The plaintiffs accept that family stability is a legitimate state goal, but they argue that licensing same-sex relationships will not burden Virginia's achievement of that goal. They

86

contend that "there is simply no evidence or reason to believe that prohibiting gay men and lesbians from marrying will increase 'responsible procreation' among heterosexuals."

But this argument does not negate any of the rational justifications for Virginia's legislation. States are permitted to selectively provide benefits to only certain groups when providing those same benefits to other groups would not further the State's ultimate goals. See Johnson v. Robinson, 415 U.S. 361, 383 (1974) ("When . . . the inclusion of one group promotes a legitimate governmental purpose, and the addition of other groups would not, we cannot say that the statute's classification of beneficiaries and nonbeneficiaries is invidiously discriminatory"). Here, the Commonwealth's goal of ensuring that unplanned children are raised in stable homes is furthered only by offering the benefits of marriage to opposite-sex couples. As Virginia correctly asserts, "the relevant inquiry here is not whether excluding same-sex couples from marriage furthers [Virginia's] interest in steering man-woman couples into marriage." Rather, the relevant inquiry is whether also recognizing same-sex marriages would further Virginia's interests. With regard to its interest in ensuring stable families in the event of unplanned pregnancies, it would not.

The plaintiffs reply that even if this is so, such "line-drawing" only makes sense if the resources at issue are scarce,

87

justifying the State's limited provision of those resources. They argue that because "[m]arriage licenses . . . are not a remotely scarce commodity," the line-drawing done by Virginia's marriage laws is irrational. But this fundamentally misunderstands the nature of marriage benefits. When the Commonwealth grants a marriage, it does not simply give the couple a piece of paper and a title. Rather, it provides a substantial subsidy to the married couple -- economic benefits that, the plaintiffs repeatedly assert, are being denied them. For example, married couples are permitted to file state income taxes jointly, lowering their tax rates. See Va. Code Ann. § 58.1-324. Although indirect, such benefits are clearly subsidies that come at a cost to the Commonwealth. Virginia is willing to provide these subsidies because they encourage opposite-sex couples to marry, which tends to provide children from unplanned pregnancies with a more stable environment. Under Johnson, the Commonwealth is not obligated to similarly subsidize same-sex marriages, since doing so could not possibly further its interest. This is no different from the subsidies provided in other cases where the Supreme Court has upheld line-drawing, such as Medicare benefits, Matthews v. Diaz, 426 U.S. 67, 83-84 (1976), or veterans' educational benefits, Johnson, 415 U.S. at 383.

As an additional argument, Virginia maintains that marriage is a "[c]omplex social institution[]" with a "set of norms, rules, patterns, and expectations that powerfully (albeit often unconsciously) affect people's choices, actions, and perspectives." It asserts that discarding the traditional definition of marriage will have far-reaching consequences that cannot easily be predicted, including "sever[ing] the inherent link between procreation . . . and marriage . . . [and] in turn . . . powerfully convey[ing] that marriage exists to advance adult desires rather than [to] serv[e] children's needs."

The plaintiffs agree that changing the definition of marriage may have unforeseen social effects, but they argue that such predictions should not be enough to save Virginia's marriage laws because similar justifications were rejected in Loving. The Loving Court, however, was not applying rational-basis review. See Loving, 388 U.S. at 11-12. We are on a different footing here. Under rational-basis review, legislative choices "may be based on rational speculation unsupported by evidence or empirical data." Beach Commc'ns, 508 U.S. at 315. "Sound policymaking often requires legislators to forecast future events and to anticipate the likely impact of these events based on deductions and inferences for which complete empirical support may be unavailable." Turner Broad.

89

<u>Sys., Inc. v. FCC</u>, 512 U.S. 622, 665 (1994) (plurality opinion). And the legislature "is far better equipped than the judiciary" to make these evaluations and ultimately decide on a course of action based on its predictions. <u>Id.</u> at 665-66. In enacting its marriage laws, Virginia predicted that changing the definition of marriage would have a negative effect on children and on the family structure. Although other States do not share those concerns, such evaluations were nonetheless squarely within the province of the Commonwealth's legislature and its citizens, who voted to amend Virginia's Constitution in 2006.

Virginia has undoubtedly articulated sufficient rational bases for its marriage laws, and I would find that those bases constitutionally justify the laws. Those laws are grounded on the biological connection of men and women; the potential for their having children; the family order needed in raising children; and, on a larger scale, the political order resulting from stable family units. Moreover, I would add that the traditional marriage relationship encourages a family structure that is intergenerational, giving children not only a structure in which to be raised but also an identity and a strong relational context. The marriage of a man and a woman thus rationally promotes a correlation between biological order and political order. Because Virginia's marriage laws are

rationally related to its legitimate purposes, they withstand rational-basis scrutiny under the Due Process Clause.

IV

The majority does not substantively address the plaintiffs' second argument -- that Virginia's marriage laws invidiously discriminate on the basis of sexual orientation, in violation of the Equal Protection Clause -- since it finds that the laws infringe on the plaintiffs' fundamental right to marriage. But because I find no fundamental right is infringed by the laws, I also address discrimination under the Equal Protection Clause.

The Equal Protection Clause, which forbids any State from "deny[ing] to any person within its jurisdiction the equal protection of the laws," U.S. Const. amend. XIV, § 1, prohibits invidious discrimination among classes of persons. Some classifications -- such as those based on race, alienage, or national origin -- are "so seldom relevant to the achievement of any legitimate state interest that laws grounded in such considerations are deemed to reflect prejudice and antipathy -- a view that those in the burdened class are not as worthy or deserving as others." City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 440 (1985). Any laws based on such "suspect" classifications are subject to strict scrutiny. See id. In a similar vein, classifications based on gender are "quasi-

suspect" and call for "intermediate scrutiny" because they "frequently bear[] no relation to ability to perform or contribute to society" and thus "generally provide[] no sensible ground for differential treatment." Id. at 440-41 (quoting Frontiero v. Richardson, 411 U.S. 677, 686 (1973) (plurality opinion)); see also Craig v. Boren, 429 U.S. 190, 197 (1976). Laws subject to intermediate scrutiny must be substantially related to an important government objective. See United States v. Virginia, 518 U.S. 515, 533 (1996).

But when a regulation adversely affects members of a class that is not suspect or quasi-suspect, the regulation is "presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." City of Cleburne, 473 U.S. at 440 (emphasis added). Moreover, the Supreme Court has made it clear that

> where individuals in the group affected by a law have distinguishing characteristics relevant to interests the State has the authority to implement, the courts have been very reluctant, as they should be in our federal system and with our respect for the separation of powers, to closely scrutinize legislative choices as to whether, how, and to what extent those interests should be pursued. In such cases, the Equal Protection Clause requires only a rational means to serve a legitimate end.

Id. at 441-42 (emphasis added). This is based on the understanding that "equal protection of the laws must coexist

92

with the practical necessity that most legislation classifies for one purpose or another, with resulting disadvantage to various groups or persons." Romer, 517 U.S. at 631.

The plaintiffs contend that Virginia's marriage laws should be subjected to some level of heightened scrutiny because they discriminate on the basis of sexual orientation. Yet they concede that neither the Supreme Court nor the Fourth Circuit has ever applied heightened scrutiny to a classification based on sexual orientation. They urge this court to do so for the first time. Governing precedent, however, counsels otherwise.

In Romer v. Evans, the Supreme Court did not employ any heightened level of scrutiny in evaluating a Colorado constitutional amendment that prohibited state and local governments from enacting legislation that would allow persons to claim "any minority status, quota preferences, protected status, or . . . discrimination" based on sexual orientation. Romer, 517 U.S. at 624. In holding the amendment unconstitutional under the Equal Protection Clause, the Court applied rational-basis review. See id. at 631-33.

And the Supreme Court made no change as to the appropriate level of scrutiny in its more recent decision in Windsor, which held Section 3 of the Defense of Marriage Act unconstitutional. The Court was presented an opportunity to alter the Romer standard but did not do so. Although it did not state the level

of scrutiny being applied, it did explicitly rely on rational-basis cases like Romer and Department of Agriculture v. Moreno, 413 U.S. 528 (1973). See Windsor, 133 S. Ct. at 2693. In his dissenting opinion in Windsor, Justice Scalia thus noted, "As nearly as I can tell, the Court agrees [that rational-basis review applies]; its opinion does not apply strict scrutiny, and its central propositions are taken from rational-basis cases like Moreno." Id. at 2706 (Scalia, J., dissenting).

Finally, we have concluded that rational-basis review applies to classifications based on sexual orientation. See Veney v. Wyche, 293 F.3d 726, 731-32 (4th Cir. 2002). In Veney, a prisoner filed a § 1983 action alleging that he had been discriminated against on the basis of sexual preference and gender. Id. at 729-30. We noted that the plaintiff "[did] not allege that he [was] a member of a suspect class. Rather, he claim[ed] that he ha[d] been discriminated against on the basis of sexual preference and gender. Outside the prison context, the former is subject to rational basis review, see Romer v. Evans, 517 U.S. 620, 631-32 (1996)." Id. at 731-32 (footnote omitted).

The vast majority of other courts of appeals have reached the same conclusion. See Cook v. Gates, 528 F.3d 42, 61 (1st Cir. 2008) ("Romer nowhere suggested that the Court recognized a new suspect class. Absent additional guidance from the Supreme

Court, we join our sister circuits in declining to read <u>Romer</u> as recognizing homosexuals as a suspect class for equal protection purposes"); <u>Price-Cornelison v. Brooks</u>, 524 F.3d 1103, 1113-14 & n.9 (10th Cir. 2008) ("A government official can . . . distinguish between its citizens on the basis of sexual orientation, if that classification bears a rational relation to some legitimate end" (internal quotation marks omitted)); <u>Citizens for Equal Prot. v. Bruning</u>, 455 F.3d 859, 865-66 (8th Cir. 2006) (discussing <u>Romer</u> and reaching the conclusion that "[t]hough the most relevant precedents are murky, we conclude for a number of reasons that [Nebraska's same-sex marriage ban] should receive rational-basis review under the Equal Protection Clause, rather than a heightened level of judicial scrutiny"); <u>Johnson v. Johnson</u>, 385 F.3d 503, 532 (5th Cir. 2004) ("[A] state violates the Equal Protection Clause if it disadvantages homosexuals for reasons lacking any rational relationship to legitimate governmental aims"); <u>Lofton v. Sec'y of Dep't of Children & Family Servs.</u>, 358 F.3d 804, 818 (11th Cir. 2004) ("[A]ll of our sister circuits that have considered the question have declined to treat homosexuals as a suspect class. Because the present case involves neither a fundamental right nor a suspect class, we review the . . . statute under the rational-basis standard" (footnote omitted)); <u>Equal. Found. of Greater Cincinnati, Inc. v. City of</u>

Cincinnati, 128 F.3d 289, 294, 300 (6th Cir. 1997) (applying rational-basis review in upholding a city charter amendment restricting homosexual rights and stating that in Romer, the Court "did not assess Colorado Amendment 2 under 'strict scrutiny' or 'intermediate scrutiny' standards, but instead ultimately applied 'rational relationship' strictures to that enactment and resolved that the Colorado state constitutional provision did not invade any fundamental right and did not target any suspect class or quasi-suspect class"); Ben-Shalom v. Marsh, 881 F.2d 454, 464 (7th Cir. 1989) (applying rational-basis review prior to the announcement of Romer); Woodward v. United States, 871 F.2d 1068, 1076 (Fed. Cir. 1989) ("The Supreme Court has identified only three suspect classes: racial status, national ancestry and ethnic original, and alienage. Two other classifications have been identified by the Court as quasi-suspect: gender and illegitimacy. [Plaintiff] would have this court add homosexuality to that list. This we decline to do" (citations and footnote omitted)). But see SmithKline Beecham Corp. v. Abbott Labs., 740 F.3d 471, 481 (9th Cir. 2014) (applying heightened scrutiny to a Batson challenge that was based on sexual orientation); Windsor v. United States, 699 F.3d 169, 180-85 (2d Cir. 2012) (finding intermediate scrutiny appropriate in assessing the constitutionality of Section 3 of the Defense of Marriage Act).

96

Thus, following Supreme Court and Fourth Circuit precedent, I would hold that Virginia's marriage laws are subject to rational-basis review. Applying that standard, I conclude that there is a rational basis for the laws, as explained in Part III, above. At bottom, I agree with Justice Alito's reasoning that "[i]n asking the court to determine that [Virginia's marriage laws are] subject to and violate[] heightened scrutiny, [the plaintiffs] thus ask us to rule that the presence of two members of the opposite sex is as rationally related to marriage as white skin is to voting or a Y-chromosome is to the ability to administer an estate. That is a striking request and one that unelected judges should pause before granting." Windsor, 133 S. Ct. at 2717-18 (Alito, J., dissenting).

V

Whether to recognize same-sex marriage is an ongoing and highly engaged political debate taking place across the Nation, and the States are divided on the issue. The majority of courts have struck down statutes that deny recognition of same-sex marriage, doing so almost exclusively on the idea that same-sex marriage is encompassed by the fundamental right to marry that is protected by the Due Process Clause. While I express no viewpoint on the merits of the policy debate, I do strongly disagree with the assertion that same-sex marriage is subject to

97

the same constitutional protections as the traditional right to marry.

Because there is no fundamental right to same-sex marriage and there are rational reasons for not recognizing it, just as there are rational reasons for recognizing it, I conclude that we, in the Third Branch, must allow the States to enact legislation on the subject in accordance with their political processes. The U.S. Constitution does not, in my judgment, restrict the States' policy choices on this issue. If given the choice, some States will surely recognize same-sex marriage and some will surely not. But that is, to be sure, the beauty of federalism.

I would reverse the district court's judgment and defer to Virginia's political choice in defining marriage as only between one man and one woman.